[Sac. No. 7885. In Bank. Aug. 26, 1971.]

JOSEPH ANTHONY RANDONE et al., Petitioners, v.
THE APPELLATE DEPARTMENT OF THE
SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
NORTHERN CALIFORNIA COLLECTION SERVICE INC. OF
SACRAMENTO, Real Party in Interest.

538

## COUNSEL

James F. King, Jr., David M. Blicker, Blackmon, Isenberg, Moulds & Blicker and Gary M. Gallery for Petitioners.

Evelle J. Younger, Attorney General, Andrea Sheridan Ordin, Deputy Attorney General, Herbert Gall, John Gall, Hill, Farrer & Burrill and Jack R. White as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Dahl, Hefner, Stark, Marois & James, John D. Bessey and Loren S. Dahl for Real Party in Interest.

Gitelson, Katz, Hoyt & Blum, James M. Conners, Alfred Gitelson, George R. Richter, Jr., Merrill R. Francis, William M. Burke, Anderson, McPharlin & Conners, Peter R. Regal, Robert D. Raven, Bernard Shapiro and Gendel, Raskoff, Shapiro & Quittner as Amici Curiae on behalf of Real Party in Interest.

## OPINION

**TOBRINER, J.**—For more than a century California creditors have enjoyed the benefits of a variety of summary prejudgment remedies, and, until recently, the propriety of such procedures has gone largely unchallenged. In June 1969, however, the United States Supreme Court in *Sniadach* v. *Family Finance Corp.* (1969) 395 U.S. 337 [23 L.Ed.2d 349, 89 S.Ct. 1820], concluded that a Wisconsin prejudgment wage garnishment statute violated a debtor's right to procedural due process, by sanctioning the "taking" of his property without affording him prior notice and hearing. The force of the constitutional principles underlying the *Sniadach* decision has brought the validity of many of our state's summary prejudgment remedies into serious question.

In *McCallop* v. *Carberry* (1970) 1 Cal.3d 903 [83 Cal.Rptr. 666, 464 P.2d 122] and *Cline* v. *Credit Bureau of Santa Clara Valley* (1970) 1 Cal. 3d 908 [83 Cal.Rptr. 669, 464 P.2d 125], we examined the California wage garnishment statutes in light of *Sniadach* and, although the California provisions differed from the Wisconsin statute in several respects (see 1 Cal. 3d at p. 906, fn. 7), we concluded that the California procedure exhibited the same fundamental, constitutional vice as the statute invalidated in *Sniadach*. More recently, our court has determined in *Blair* v. *Pitchess* (1971) 5 Cal.3d 258 [96 Cal.Rptr. 42, 486 P.2d 1242] that California's present claim and delivery procedures, permitting prejudgment replevin prior to notice or hearing, cannot withstand the constitutional scrutiny dictated by *Sniadach*. In the instant proceeding we are faced with a similar challenge to one segment of California's prejudgment attachment procedure, section 537, subdivision 1, of the Code of Civil Procedure, which, in general, permits the attachment of any property of the defendant-debtor, without prior notice or hearing, upon the filing of an action on an express or implied contract for the payment of money.[1]

---

[1]Section 537, subdivision 1 provides in full: "The plaintiff, at the time of issuing the summons, or at any time afterward, may have the property of the defendant attached, except earnings of the defendant as provided in Section 690.6, as security for the satisfaction of any judgment that may be recovered, unless the defendant gives security to pay such judgment, as in this chapter provided, in the following cases:

1. In an action upon a contract, express or implied, for the direct payment of money, (a) where the contract is made or is payable in this state; or (b) where the contract is made outside this state and is not payable in this state and the amount of the claim based upon such contract exceeds five thousand dollars ($5,000); and where the contract described in either (a) or (b) is not secured by any mortgage, deed of trust, or lien upon real or personal property, or any pledge of personal property, or, if originally so secured, such security has, without any act of the plaintiff, or the person to whom the security was given, become valueless. An action upon any liability existing under the laws of this state, of a spouse, relative, or kindred, for the

For the reasons discussed below, we have concluded that in light of the constitutional precepts embodied by *Sniadach* and this court's subsequent decisions in *McCallop, Cline* and *Blair,* the prejudgment attachment procedure sanctioned by subdivision 1 of section 537 violates procedural due process as guaranteed by article I, section 13 of the California Constitution and the Fifth and Fourteenth Amendments of the United States Constitution. In reaching this conclusion we note that the Supreme Courts of Minnesota and Wisconsin have recently arrived at similar determinations, invalidating general prejudgment garnishment statutes on the authority of *Sniadach. (Jones Press, Inc.* v. *Motor Travel Service, Inc.* (1970) 286 Minn. 205 [176 N.W.2d 87]; *Larson* v. *Fetherston* (1969) 44 Wis.2d 712 [172 N.W.2d 20].)

■ The recent line of cases, commencing with *Sniadach,* reaffirms the principle that an individual must be afforded notice and an opportunity for a hearing before he is deprived of any significant property interest, and that exceptions to this principle can only be justified in "extraordinary circumstances." Section 537, subdivision 1, drafted long before the decision in *Sniadach,* does not narrowly draw into focus those "extraordinary circumstances" in which summary seizure may be actually required. Instead, the provision sweeps broadly, approving attachment over the entire range of "contract actions," a classification which has no rational relation to either the public's or creditors' need for extraordinary prejudgment relief. Moreover, the subdivision at issue fails to take into account the varying degrees of deprivation which result from the attachment of different kinds of property. Consequently, the section improperly permits a writ of attachment to issue without notice or hearing even in situations in which the attachment deprives a debtor of "necessities of life"; this wide overbreadth of the statute condemns it. In light of these substantial constitutional infirmities inherent in the provision, we find that the lower court abused its discretion in refusing to release the attachment of defendants' bank account and thus we conclude that a writ of mandate should issue.

## 1. *The facts of the instant case.*

This constitutional challenge arises out of the attachment of a bank account of Mr. and Mrs. Joseph Randone by the Thunderbird Collection Services, Inc., a licensed collection agency registered under the name of

---

support, maintenance, care, or necessaries furnished to the other spouse, or other relatives or kindred, shall be deemed to be an action upon an implied contract within the term as used throughout all subdivisions of this section. An action brought pursuant to Section 1692 of the Civil Code shall be deemed an action upon an implied contract within the meaning of that term as used in this section."

All section references are to the Code of Civil Procedure, unless otherwise indicated.

Northern California Collection Service, Inc. of Sacramento. On February 16, 1970, the collection agency filed an action against the Randones, as individuals and doing business as Randone Trucking, alleging (1) that the Randones had failed to pay a bill for $490 for services rendered to them by the Sacramento law firm of Cohen, Cooper and Ziloff, (2) that the collection agency was the assignee of that debt, and thus, (3) that the Randones were indebted to the collection agency for the $490 principal, plus $130 in accumulated interest.

On March 17, 1970, the collection agency secured a writ of attachment from the Clerk of the Sacramento County Municipal Court and levied that attachment upon the defendants' checking account at a branch of the Crocker-Citizens Bank in Fair Oaks, California. At the time the bank account contained $176.20 and, pursuant to the attachment, that amount continues to be withheld from the Randones by their bank pending receipt of a court order releasing the attachment.

On March 31, 1970, the Randones filed a motion to dissolve the attachment on the ground that the issuance of the writ prior to judgment constituted a violation of due process; they cited the *Sniadach, McCallop* and *Cline* cases as authority for their contention. At the same time they also filed an affidavit attesting that their sole source of income was unemployment insurance; in light of the hardship caused by the attachment of their bank accounts, they requested that the court shorten the time before the hearing of their motion. Pursuant to this request, the court noticed the motion to dissolve the attachment for argument on April 3, 1970.

On April 3 the municipal court heard the motion and denied it. The Randones filed a timely notice of appeal to the Appellate Department of the Superior Court of Sacramento County, again contending that the rationale of *Sniadach* and its California progeny required that a debtor be afforded notice and a hearing prior to the attachment of his bank account. On October 29, 1970, the appellate department affirmed the municipal court decision without written opinion. The Randones thereafter requested that in light of the general importance of the issues presented, the case be certified to the Court of Appeal, but on November 5, 1970, the appellate department denied this petition as well.

Having exhausted all the available procedural measures on appeal, the Randones petitioned this court for an original writ to review the lower court decision maintaining the attachment. Recognizing that defendants' challenge to the constitutionality of section 537, subdivision 1, involved a question of general importance, over which a considerable conflict had

emerged in our lower courts,[2] and that the issue would often arise in municipal court proceedings from which no appeal to our court would be possible without a certification by the superior court, we exercised our discretion and issued an alternative writ of mandamus to determine whether the lower court abused its discretion in refusing to dissolve the attachment at issue. ■ "[B]y so doing, 'we have necessarily determined that there is no adequate remedy in the ordinary course of law and that [this] case is a proper one for the exercise of our original jurisdiction.' (*Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 773 [87 Cal.Rptr. 839, 471 P.2d 847].)" (*San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937, 945 [92 Cal.Rptr. 309, 479 P.2d 669]; see also *Schweiger* v. *Superior Court* (1970) 3 Cal.3d 507, 517-518 [90 Cal.Rptr. 729, 476 P.2d 97].)

*2. Section 537, subdivision 1, permits the initial attachment of all of a debtor's property without affording the individual either notice of the attachment or a prior hearing to contest the attachment.*

Our review of the constitutionality of the attachment provision at issue necessarily begins with an examination of the actual operation of the attachment procedure under existing law and a comparison of this procedure with the procedures found inadequate in *Sniadach, McCallop, Cline* and *Blair.*

■ In California "attachment" is a purely statutory remedy (*Ponsonby* v. *Sacramento Suburban Fruit Lands Co.* (1930) 210 Cal. 229, 232 [291 P. 167]) activated by a plaintiff, under which the property of a defendant is "seized" by legal process in advance of trial and judgment.[3] Under section 537 and the succeeding sections of the Code of Civil Procedure dealing with attachments (Code Civ. Proc., §§ 537-561, 690-690.52), an attachment is initiated by a writ issued by the clerk of the court in which a plaintiff has filed suit; the writ commands the sheriff of a county in which assets of a defendant are located to take custody of that property. The writ

[2] Compare *Western Bd. of Adjusters, Inc.* v. *Covina Pub. Co.* (1970) 9 Cal.App.3d 659, 674 [88 Cal.Rptr. 293], and *Johnston* v. *Cunningham* (1970) 12 Cal.App.3d 123, 128-129 [90 Cal.Rptr. 487] with *Mihans* v. *Municipal Court* (1970) 7 Cal.App. 3d 479, 486, 488 [87 Cal.Rptr. 17]; cf. *Klim* v. *Jones* (N.D.Cal. 1970) 315 F.Supp. 109; *Java* v. *California Dept. of Human Resources* (N.D.Cal. 1970) 317 F.Supp. 875, 878 (three-judge court), affd. (1971) 402 U.S. 121 [28 L.Ed.2d 666, 91 S.Ct. 1347].

[3] "Garnishment" constitutes a sub-category of "attachment," referring to the seizure or attachment of property belonging to or owing to the debtor, but which is presently in the possession of a third party. (See Black's Law Dictionary (4th ed. 1957) p. 810; *Frank F. Fasi Supply Co.* v. *Wigwam Investment Co.* (D.Hawaii 1969) 308 F.Supp. 59, 61.) Thus the "attachment" of the Randone bank account in the instant case is technically a "garnishment" of their funds, since their assets were in the hands of a third party, the bank, when they were seized by legal process.

is available only in those classes of action enumerated in section 537; the subdivision at issue in this proceeding permits the issuance of a writ at any time after the plaintiff has filed an action "upon a[n unsecured] contract, express or implied, for the direct payment of money."

With the exception of a new exclusion of earnings of a defendant, enacted in 1970 (Stats. 1970, ch. 1523, § 2), subdivision 1 does not limit its operation to specific categories of property owned by a defendant, e.g., to non-necessities or to real estate, but instead permits the attachment of *any* property of a defendant, allowing the creditor to select which assets of the defendant should be subjected to attachment. Moreover, this subdivision does not require a creditor to prove, or indeed even allege, any special circumstances requiring the immediate attachment of the defendant's property in the specific case; so long as the creditor's complaint alleges a cause of action in contract for the direct payment of money, subdivision 1 authorizes the issuance of a writ against all debtors alike.

To obtain the writ of attachment under subdivision 1, the plaintiff must file a declaration with the clerk of the court stating that his cause of action is in contract and qualifies under the subdivision (Code Civ. Proc., § 538); he must at the same time file an undertaking for not less than one-half of the total indebtedness claimed or one-half of the value of the property sought to be attached. (*Id.,* § 539.) Once the clerk receives these written declarations, he is authorized to issue the writ of attachment immediately. No judicial officer scrutinizes the papers. Neither notice of the proposed attachment nor opportunity to contest the attachment before its issuance is afforded to the debtor. Indeed, the right to attach any asset *without notice to the debtor* is specifically granted to the creditor by section 537.5, which provides that, upon the request of the creditor, the clerk "shall not make public the fact of the filing of the complaint, or of the issuance of the attachment, until after the filing of the return of service of the writ of attachment. . . ."

Upon issuance, the clerk forwards the writ to the appropriate sheriff, together with a detailed description of the property to be attached. After receiving the writ the sheriff attempts to levy on the property; the actual form assumed by the levy turns upon the nature of the property (see *id.,* §§ 541, 542), but, unless the property attached consists of real estate,[4] the

---

[4]Because the attachment of real estate does not generally deprive an owner of the use of his property, but merely constitutes a lien on the property, the "taking" generated by such attachment is frequently less severe than that arising from other attachments. In view of this basic difference in the effect of such attachment, it has been suggested that a statute which dealt solely with the attachment of real estate might possibly involve constitutional considerations of a different magnitude than those discussed hereafter.

levy necessarily deprives the defendant of any right to the use of the property while the attachment remains in force. Thus, in the instant case, although the bank deposits attached were not removed from the bank, defendants were still prevented from using the funds. Property seized by levy is held pursuant to the attachment provisions for *three years,* unless released earlier pursuant to an order obtained by the defendant (*id.,* §§ 542a, 542b).[5]

The summary procedure outlined above empowers a creditor to obtain an attachment of any property of a debtor (excluding wages) without affording the debtor notice or hearing and without proving a special need for such a drastic remedy. Recognizing the resultant hardship to the debtor, the present statutory scheme permits him to move for release of the property on the grounds that it is exempt from attachment under one or more of the provisions of sections 690-690.29.[6] The exemption statutes cover a wide range of property, and disclose a general legislative intent to permit a debtor to secure the release of assets particularly vital to him and his family for life and livelihood. Despite this salutary policy,[7] the scope of the specific exemptions has frequently proven insufficient, necessitating numerous amendments (see Note (1941) 15 So.Cal.L.Rev. 1, 20); as a consequence,

(See generally Note, *Attachment in California: A New Look at an Old Writ* (1970) 22 Stan.L.Rev. 1254, 1277-1279.) The instant statute is not so limited, however, and the great majority of cases arising under it do involve the deprivation of an owner's use of his property; thus we have no occasion in this proceeding to speculate as to the constitutionality of a prejudgment attachment provision which does not significantly impair such use.

[5]In general a debtor may secure the release of an attachment (1) by posting a bond, filing an undertaking or paying the amount of the creditor's demand plus costs to the sheriff (Code Civ. Proc., §§ 540, 554, 555), (2) prevailing on the underlying action and obtaining a court order for release, or (3) prevailing on a claim that the seized property is exempt from attachment (Code Civ. Proc., §§ 690-690.29.)

[6]As noted above, in 1970 the Legislature responded to our decisions in *McCallop* and *Cline* by completely excluding earnings from prejudgment attachment. At the same time the Legislature also revised several sections of the statutory exemption provision by providing that as to certain limited categories of property, primarily *unpaid* governmental benefits (e.g., workmen's compensation award (Code Civ. Proc., § 690.15), unemployment compensation benefits (*id.,* § 690.175) and welfare benefits (*id.,* § 690.19)), the property would be exempt from attachment or execution without the filing of a claim for exemption by the debtor. This new procedure, however, applies to only a very small proportion of the "exempted" property; the bulk of a debtor's necessities, even as defined by the exemption provisions, remains subject to immediate attachment by the creditor.

[7]"The basic theory of such exemption is that a debtor and his family, regardless of the debtor's improvidence, will retain enough money to maintain a basic standard of living in order that the debtor may have a fair chance to remain a productive member of the community. [Citations.] The statute should be liberally construed in order to effectuate this purpose." (*Perfection Paints Products* v. *Johnson* (1958) 164 Cal.App.2d 739, 741 [330 P.2d 829].)

over the years the exemption provisions have taken on the contrasting colors of a Fauve painting. Their inequity and inadequacy have at times engendered serious criticism. (See, e.g., Rifkind, *Archaic Exemption Laws* (1964) 39 State Bar J. 370; Seid, *Necessaries—Common or Otherwise* (1962) 14 Hastings L.J. 28; Note (1935) 23 Cal.L.Rev. 414.) Moreover, as we noted in *McCallop* v. *Carberry* (1970) 1 Cal.3d 903, 907 [83 Cal. Rptr. 666, 464 P.2d 122], under the procedures afforded for establishing the exempt nature of attached property, a debtor before obtaining a release of the attachment, may be forced to wait a period of 25 days.

From this brief review of the statutory provisions, the broad outline of the prejudgment attachment procedure becomes clear. Under section 537, subdivision 1, an unsecured contract creditor can, as a matter of course, obtain an attachment of almost any of the debtor's property, without notice to the debtor and without an opportunity for a hearing. Although the statutory scheme affords some relief to the debtor by virtue of the varied exemption provisions, these sections impose the burden of going forward on the defendant, and, even if pursued with vigor, these procedures result in an inevitable delay during which the debtor will be effectively deprived of the use of his property.

The procedure for attachment reviewed above finds a marked parallel in the statutory procedures held unconstitutional in *Sniadach* and in the decisions following that case. The Wisconsin wage garnishment statute invalidated in *Sniadach,* like section 537, subdivision 1, permitted the "attachment" of a debtor's property without notice to the debtor and without affording the debtor an opportunity to be heard. Although the Wisconsin statute apparently did not contain exemption provisions as generous as those provided by California law, such exemptions, generally available only *after* attachment, were found in *McCallop* and *Cline* insufficient to cure the procedure's constitutional defects. Moreover, the attachment procedure here operates even more harshly than the procedure invalidated in *McCallop* and *Cline,* for the wage garnishment provision at issue in those cases at least provided for prior notice to the debtor. (See *McCallop* v. *Carberry* (1970) 1 Cal.3d 903, 906 fn. 7 [83 Cal.Rptr. 666, 464 P.2d 122].)

Despite the marked similarities between the procedure challenged here and the procedures overturned by the above authorities, the creditor contends that *Sniadach* does not invalidate the instant statute. First, the collection agency contends that the constitutional holding in *Sniadach* largely rested upon the "peculiar" nature of wages and the unique dangers imposed by prejudgment wage garnishment, and, since section 537 does not permit attachment of wages, it suggests that *Sniadach* does not apply. Second, the

creditor claims that even if it does, the deprivations imposed on debtors by this general attachment statute are not as serious as those incident to wage garnishment, and do not require prior notice or hearing. Finally, the agency argues that the interests served by affording creditors the prenotice attachment remedy are sufficient to justify the current procedure.

As discussed more fully below, we have concluded that all of these contentions pale before the procedural "due process" rights of debtors elucidated in *Sniadach*. Initially, we shall explain that rather than creating a special constitutional rule for wages, the *Sniadach* opinion returned the entire domain of prejudgment remedies to the long-standing procedural due process principle which dictates that, except in extraordinary circumstances, an individual may not be deprived of his life, liberty or property without notice and hearing. Thereafter, we shall point out that subdivision 1 is not carefully tailored to limit its effect to such "extraordinary" situations. Finally, we indicate that since the provision is drafted so broadly that it permits the attachment of a debtor's "necessities of life" prior to a hearing upon the validity of the creditor's claim, it, in any event, violates due process.

Prejudgment attachment can constitutionally be sanctioned only under a much more narrowly drafted statute, one which is cognizant of, and sensitive to, the constitutional interests exposed by *Sniadach* and the subsequent cases.

■ 3. *The constitutional principles underlying Sniadach are not confined to wage garnishment; the decision instead embodies the general "due process" precept that, except in "extraordinary circumstances," an individual is guaranteed a right to notice and hearing before he is deprived of a significant interest.*

The agency's primary contention before this court is that the United States Supreme Court decision in *Sniadach* is limited to prejudgment wage garnishment. Relying on the *Sniadach* majority's emphasis of the particular hazards emanating from the garnishment of wages (395 U.S. at pp. 340-341 [23 L.Ed.2d at pp. 353-354]) and the opinion's characterization of wages as "a specialized type of property presenting distinct problems in our economic system," (395 U.S. at p. 340 [23 L.Ed.2d at p. 353]) the collection agency argues that this court's earlier decisions in *McCallop* v. *Carberry* (1970) 1 Cal.3d 903 [83 Cal.Rptr. 666, 464 P.2d 122], and *Cline* v. *Credit Bureau of Santa Clara Valley* (1970) 1 Cal.3d 908 [83 Cal. Rptr. 669, 464 P.2d 125], invalidating California garnishment procedures insofar as they apply to wages, exhaust the constitutional reach of the *Sniadach* decision.

We recently confronted an identical argument in *Blair* v. *Pitchess* (1971) *ante,* pp. 258, 280 [96 Cal.Rptr. 42, 486 P.2d 1242], in the context of a challenge to the California claim and delivery procedure. Because the property subject to seizure under the questioned prejudgment replevin provisions consisted of tangible personal property rather than an employee's wages, defendants in *Blair* claimed that the *Sniadach* decision did not apply. This court, however, unequivocally rejected such an attempt to confine *Sniadach's* rationale to the facts of the case. Noting the liberal application that had been accorded the *Sniadach* principle in a wide variety of contexts outside of wage garnishment,[8] we concluded that by permitting the seizing and holding of a debtor's personal property without prior notice or hearing, "California's claim and delivery law violates the due process clauses of the Fifth and Fourteenth Amendments of the United States Constitution and section 13 of article 1 of the California Constitution." (*Blair* v. *Pitchess* (1971) *ante,* pp. 258, 281 [96 Cal.Rptr. 42, 486 P.2d 1242].)[9]

Our conclusion in *Blair* fully recognized that the *Sniadach* decision did not establish a new constitutional rule for wages but, on the contrary, simply brought the traditional procedural due process analysis, worked out

---

[8]The decisions cited in *Blair* vividly illuminate the broad scope of *Sniadach* outside of the wage garnishment context. (See, e.g., *Goldberg* v. *Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011] (termination of welfare payments); *Klim* v. *Jones* (N.D.Cal. 1970) 315 F.Supp. 109 (seizure by innkeeper); *Swarb* v. *Lennox* (E.D.Pa. 1970) 314 F.Supp. 1091, prob. juris. noted (1971) 401 U.S. 991 [28 L.Ed. 2d 529, 91 S.Ct. 1220] (confession judgment); *Mihans* v. *Municipal Court* (1970) 7 Cal.App.3d 479 [87 Cal.Rptr. 17] (repossession of residence).)

Other recent decisions have continued this far-reaching trend. (See *Santiago* v. *McElroy* (E.D.Pa. 1970) 319 F.Supp. 284 (three-judge court) (levy on tenant's possessions by landlord); *McConaghley* v. *City of New York* (1969) 60 Misc.2d 825 [304 N.Y.S.2d 136] (seizure by hospital); *Desmond* v. *Hachey* (D.Me. 1970) 315 F.Supp. 328 (three-judge court) (imprisonment of debtor); *Amanuensis Ltd.* v. *Brown* (1971) 65 Misc.2d 15 [318 N.Y.S.2d 11, 20-21] (tenant's prior payment of rent prerequisite to proffer of defense); *Ricucci* v. *United States* (1970) 425 F.2d 1252, 1256-1257 [192 Ct.Cl. 1] (Skelton, J. concurring) (termination of employment); cf. *Dale* v. *Hahn* (S.D.N.Y. 1970) 311 F.Supp. 1293 (appointment of committee to manage incompetent's property); *Downs* v. *Jacob* (Del. 1970) 272 A.2d 706, 708-709 (seizure by landlord).)

[9]One amicus suggests that the attachment procedure at issue in this case can be distinguished from the claim and delivery procedures examined in *Blair* on the grounds that a plaintiff utilizing the claim and delivery procedure may obtain possession of the seized goods whereas an "attaching" plaintiff cannot. In focusing attention on the possessory interest of the *plaintiff* in these procedures rather than on that of the *defendant,* however, this amicus misses the entire constitutional thrust of *Sniadach* as well as *Blair. Blair* holds that the fundamental vice of the claim and delivery provisions, for due process purposes, is that the procedure deprives a *defendant* of the use of his property prior to notice or hearing. The instant attachment procedure clearly shares this constitutional flaw.

over many decades of constitutional litigation,[10] to bear upon the question of the validity of summary prejudgment remedies. (See *Klim* v. *Jones* (N.D.Cal. 1970) 315 F.Supp. 109, 122.) Justice Douglas, writing for the court in *Sniadach*, expressly revealed this continuity with past constitutional doctrine: "In this case the sole question is whether there has been a taking of property without that procedural due process that is required by the Fourteenth Amendment. *We have dealt over and over again with the question of what constitutes 'the right to be heard'* [citation] *within the meaning of procedural due process. . . .* In the context of this case the question is whether the interim freezing of the wages without a chance to be heard violates procedural due process." (395 U.S. at pp. 339-340 [23 L.Ed.2d at pp. 352-353]; italics added.)

Our view of the *Sniadach* decision, as founded upon a generally applicable due process "right to be heard," is reinforced by two opinions of the United States Supreme Court rendered subsequent to *Sniadach, Goldberg* v. *Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011] and *Boddie* v. *Connecticut* (1971) 401 U.S. 371 [28 L.Ed.2d 113, 91 S.Ct. 780]. In *Goldberg*, as in *Sniadach*, the court faced the question whether procedural due process required an opportunity for some hearing before an individual suffered the deprivation of an important, indeed vital, interest. In resolving that issue the court drew upon past constitutional "right to hearing" cases, and then, most significantly, relied on the *Sniadach* decision as direct support for its ultimate conclusion that due process required that a welfare recipient be afforded an opportunity to be heard before his welfare payments could be terminated. (397 U.S. at p. 264 [25 L.Ed.2d at p. 297].)

More recently Justice Harlan, writing for the court in *Boddie*, undertook

---

[10]See, e.g., *Bell* v. *Burson* (1971) 402 U.S. 535 [29 L.Ed.2d 90, 91 S.Ct. 1586] (suspension of driver's license); *Wisconsin* v. *Constantineau* (1971) 400 U.S. 433 [27 L.Ed.2d 515, 91 S.Ct. 507] (public "posting" of individual as "excessive drinker"); *Goldberg* v. *Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011] (withdrawal of welfare benefits); *Armstrong* v. *Manzo* (1965) 380 U.S. 545 [14 L.Ed.2d 62, 85 S.Ct. 1187] (termination of parental rights); *Willner* v. *Committee on Character and Fitness* (1963) 373 U.S. 96 [10 L.Ed.2d 224, 83 S.Ct. 1175] (exclusion from practice of legal profession); *Joint Anti-Fascist Refugee Comm.* v. *McGrath* (1951) 341 U.S. 123 [95 L.Ed. 817, 71 S.Ct. 624] (inclusion on list of subversive organizations); *Mullane* v. *Central Hanover Bank and Trust Co.* (1950) 339 U.S. 306, 313 [94 L.Ed. 865, 872, 70 S.Ct. 652] (termination of beneficiary's interest in trust fund); *Opp Cotton Mills, Inc.* v. *Administrator* (1941) 312 U.S. 126, 152-153 [85 L.Ed. 624, 639-640, 61 S.Ct. 524] (establishment of industry-wide minimum wage); *Goldsmith* v. *United States Board of Tax Appeals* (1926) 270 U.S. 117, 123 [70 L.Ed. 494, 497, 46 S.Ct. 215] (rejection of accountant for practice before Board of Tax Appeals); *Coe* v. *Armour Fertilizer Works* (1915) 237 U.S. 413, 423 [59 L.Ed. 1027, 1031, 35 S.Ct. 625] (execution upon property of alleged shareholder of debtor corporation).

a general review of the cases recognizing that, "absent a countervailing state interest of overriding significance" (401 U.S. at p. 377 [28 L.Ed.2d at p. 118]), due process requires, at a minimum, that an individual be given a meaningful opportunity to be heard prior to being subjected by force of law to a significant deprivation. After noting that "[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings," the *Boddie* court continued: "That the hearing required by due process is subject to waiver, and is not fixed in form does not affect its root requirement that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest. . . ." (Original italics; 401 U.S. at pp. 378-379 [28 L.Ed.2d at p. 119].) Again the court cited *Sniadach* as authority for the latter, general proposition. (See also *Bell* v. *Burson* (1971) 402 U.S. 535, 539-543 [29 L.Ed.2d 90, 94-97, 91 S.Ct. 1586].)

Thus *Sniadach* does not mark a radical departure in constitutional adjudication. It is not a rivulet of wage garnishment but part of the mainstream of the past procedural due process decisions of the United States Supreme Court.

Similarly, our own court has frequently recognized that the most fundamental ingredient of the "due process" guaranteed by our state Constitution is "a meaningful opportunity to be heard." In this century alone we have applied this principle to such varied governmental action as the commitment of an individual to a mental institution (*In re Lambert* (1901) 134 Cal. 626, 632-633 [66 P. 851]), the civil forfeiture of property (*People* v. *Broad* (1932) 216 Cal. 1, 3-8 [12 P.2d 941]), the dispossession of a tenant from his residence (*Mendoza* v. *Small Claims Court* (1958) 49 Cal. 2d 668, 672-673 [321 P.2d 9]), the exclusion of an individual from a field of private employment (*Endler* v. *Schutzbank* (1968) 68 Cal.2d 162, 172-173 [62 Cal.Rptr. 297, 437 P.2d 297]) and the imprisonment of a debtor under mesne civil arrest. (*In re Harris* (1968) 69 Cal.2d 486, 489-490 [72 Cal.Rptr. 340, 446 P.2d 148].) (See also *Brandenstein* v. *Hoke* (1894) 101 Cal. 131, 133 [35 P. 562] (establishment of reclamation district); *Sokol* v. *Public Utilities Com.* (1966) 65 Cal.2d 247, 254-256 [53 Cal. Rptr. 673, 418 P.2d 265] (curtailment of telephone service); *Estate of Buchman* (1954) 123 Cal.App.2d 546, 559-561 [267 P.2d 73] (removal of executor).)[11] Justice Traynor, writing for a unanimous court in *Men-*

---

[11]Indeed, California courts have long preserved the individual's right to notice and a meaningful hearing in instances in which a significant deprivation is threatened by a *private* entity, as well as by a governmental body. (See *Pinsker* v. *Pacific Coast Soc. of Orthodontists* (1969) 1 Cal.3d 160, 165-166 [81 Cal.Rptr. 623, 460 P.2d 495] (exclusion from professional association); *Cason* v. *Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134, 143 [231 P.2d 6, 21 A.L.R.2d 1387] (expulsion from union);

*doza* v. *Small Claims Court* (1958) 49 Cal.2d 668, 672 [321 P.2d 9], stated the constitutional principle most succinctly: "When public necessity demands, there may be action followed by a hearing. [Citations.] Otherwise *due process requires that no person shall be deprived of a substantial right without notice and hearing.* [Citations.]" (Italics added.)[12] The decisions in *McCallop, Cline* and *Blair,* as well as in *Sniadach,* lie at the heart of this due process tradition.

To be sure, the *result* reached in *Sniadach* constituted a departure from earlier decisions which had upheld summary prejudgment attachment and garnishment; the change, however, resulted not from an alteration of principles of due process but instead from a reevaluation of the potential and actual effect of prejudgment seizure upon debtors. Prior courts had facilely reasoned that prejudgment remedies did not amount to a "taking" of property since the attachment or garnishment was only a "temporary" measure (see *McInnes* v. *McKay* (1928) 127 Me. 110, 116 [141 A. 699, 702], affd. per curiam *sub nom. McKay* v. *McInnes* (1929) 279 U.S. 820 [73 L.Ed. 975, 49 S.Ct. 344]),[13] and consequently had concluded that general due process standards were not applicable. The *Sniadach* court, in

*Taboada* v. *Sociedad Espanola etc. Mutua* (1923) 191 Cal. 187, 191-192 [215 P. 673, 27 A.L.R. 1508] (removal from fraternal society); *Otto* v. *Tailors' P. & B. Union* (1888) 75 Cal. 308, 314-315 [17 P. 217] (expulsion from union); *Curl* v. *Pacific Home* (1952) 108 Cal.App.2d 655, 659-660 [239 P.2d 481] (expulsion from old-age home).) As the court in *Taboada* explained: "It is a fundamental principle of justice that no man may be condemned or prejudiced in his rights without an opportunity to make his defense. This rule is not confined alone to courts of justice and strictly legal tribunals, but is applicable to every tribunal which has the power and authority to adjudicate questions involving legal consequences." (*Taboada* v. *Sociedad Espanola etc. Mutua* (1923) 191 Cal. 187, 191 [215 P. 673, 27 A.L.R. 1508]; cf. P. Selznick, Law, Society, and Industrial Justice (1969) pp. 252-259.)

[12]"Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." (*Mullane* v. *Central Hanover Bank and Trust Co.* (1950) 339 U.S. 306, 313 [94 L.Ed. 865, 872, 70 S.Ct. 652].)

[13]Plaintiff places substantial reliance on *McKay* v. *McInnes* (1929) 279 U.S. 820 [73 L.Ed. 975, 49 S.Ct. 344], a 1929 per curiam affirmance of a decision by the Maine Supreme Court upholding a general prejudgment attachment statute in the face of a constitutional attack. Although the majority in *Sniadach* acknowledged the existence of this prior decision, a substantial number of courts have found the vitality of *McKay* substantially impaired by the holding of *Sniadach* (see, e.g., *Jones Press, Inc.* v. *Motor Travel Service, Inc.* (1970) 286 Minn. 205, 208-209 [176 N.W.2d 87, 90]; *Laprese* v. *Raymours Furniture Co.* (N.D.N.Y. 1970) 315 F.Supp. 716, 724) and Justice Harlan, in his concurrence in *Sniadach,* rather explicitly indicated that *McKay* could not survive the *Sniadach* decision. (395 U.S. at pp. 343-344 [23 L.Ed.2d at pp. 354-355].) In view of (1) the unexplicated nature of the *McKay* opinion, (2) the carefully limited authority on which the decision was directly based (see Note, *The Constitutional Validity of Attachment in Light of Sniadach* v. *Family Finance Corp.* (1970) 17 U.C.L.A. L.Rev. 837, 844) and (3) the irreconcilable

contrast, recognized that realistically such procedures did deprive the debtor of the use of the attached property[14] and that such deprivation was indeed a "taking" of a significant property interest, which often resulted in serious hardship. Thus the majority concluded: "Where the taking of one's property is so obvious, it needs no extended argument to conclude that absent notice and a prior hearing [citation] this prejudgment garnishment procedure violates the fundamental principles of due process." (395 U.S. at p. 342 [23 L.Ed.2d at p. 354].)

Although wages may in the terminology of *Sniadach* constitute a "specialized type of property," the withholding of which clearly constitutes an extremely serious deprivation to the wage earner, California's prejudgment attachment procedure sanctions a prenotice and prehearing deprivation of a debtor's use of his property with an even greater devastating effect and a wider sweep. Although the deprivation is not a permanent one, the attachment, by statute, remains in effect for three years unless the debtor secures an earlier release. ■ The loss of the use of one's property over such a lengthy period of time cannot generally be dismissed as merely a "de minimis" (cf. *Sniadach* v. *Family Finance Corp.* (1969) 395 U.S. 337, 342 [23 L.Ed.2d 349, 354, 89 S.Ct. 1820] (Harlan, J. concurring)) or an "insubstantial" (cf. *Mendoza* v. *Small Claims Court* (1958) 49 Cal.2d 668, 672 [321 P.2d 9]) deprivation. Under the constitutional precepts reviewed above, we believe that in order for California to authorize this general deprivation of a debtor's use of his property before notice and hearing, it must demonstrate that the attachment provision serves some "state or creditor interest" (*Sniadach* v. *Family Finance Corp.* (1969) 395 U.S. 337, 339 [23 L.Ed.2d 349, 352, 89 S.Ct. 1820]) "of overriding significance" (*Boddie* v. *Connecticut* (1971) 401 U.S. 371, 377 [28 L.Ed.2d 113, 118, 91 S.Ct. 780]) which requires the procedure, and that the statute restricts attachments to those extraordinary situations.

*4. Section 537, subdivision 1, is not narrowly drawn to confine attachments to those "extraordinary situations" which require "special protection to a state or creditor interest."*

In reaffirming the general due process principle of prior notice and hearing, the *Sniadach* court declared that although the "summary procedure [established by the Wisconsin statute] may well meet the requirements of

conflict between the principles underlying *Sniadach* and *McKay's* purported holding, we believe this 40-year-old per curiam opinion is too thin a reed to support the reliance plaintiff has cast upon it.

[14]Justice Harlan, concurring in *Sniadach,* declared that "[t]he 'property' of which petitioner has been deprived is the *use* of the garnished portion of her wages during the interim period between the garnishment and the culmination of the main suit." (Original italics; 395 U.S. at p. 342 [23 L.Ed.2d at p. 354].)

due process *in extraordinary situations* [citations] . . . in the instant case no situation requiring special protection to a state or creditor interest is presented . . .; nor is the Wisconsin statute narrowly drawn to meet any such unusual condition." (395 U.S. at p. 339 [23 L.Ed.2d at p. 352]; italics added.) In our view, subdivision 1 of section 537 plainly suffers from the same constitutional infirmity.

Although the kind of "extraordinary situation" that may justify summary deprivation cannot be precisely defined, three decisions involving such situations cited by the majority in *Sniadach* give some indication of the type of countervailing interests that have been found sufficient in past cases. Both *Fahey* v. *Mallonee* (1947) 332 U.S. 245 [91 L.Ed. 2030, 67 S.Ct. 1552], and *Coffin Bros.* v. *Bennett* (1928) 277 U.S. 29 [72 L.Ed. 768, 48 S.Ct. 422] entailed the validity of summary procedures permitting specialized governmental officers to react immediately to serious financial difficulties of a banking institution by seizing operational control of the bank's assets.[15] Given this nation's considerable experience with the public danger that can flow directly and precipitously from bank failures,[16] and the closely regulated nature of the banking industry, the court determined in both cases that the challenged procedures were sufficiently focused to meet an exceptional problem and thus that the procedures were constitutional.

In *Ewing* v. *Mytinger & Casselberry, Inc.* (1950) 339 U.S. 594 [94 L.Ed. 1088, 70 S.Ct. 870], the general public interest at stake was even more compelling than in the banking cases, for the challenged procedure permitted the federal Food and Drug Administrator summarily to seize misbranded drugs which the administrator had probable cause to believe endangered health or would mislead consumers. The government's authority to protect the public health is of course of paramount importance. Because many individuals might be injured by unwholesome or improperly

[15]In *Fahey* the designated public official was the Federal Home Loan Bank Administrator. Upon determining that a federal savings and loan association was conducting its affairs in an "unlawful, unauthorized and unsafe" manner and was thus jeopardizing the interests of its members, its creditors and the public, the administrator was authorized to appoint a conservator who would immediately, without notice or hearing, take control of the association's operations.

In *Coffin,* "a Georgia statute authorized the superintendent of banks to issue a notice of assessment to the stockholders of an insolvent bank, and then to issue and levy an execution against any stockholder who neglected to pay, thereby creating a lien before any judicial proceeding; the stockholders were allowed to thereafter raise and try any defense claimed by them." (*McCallop* v. *Carberry* (1970) 1 Cal.3d 903, 905, fn. 3 [83 Cal.Rptr. 666, 464 P.2d 122].)

[16]The *Coffin* decision was rendered at about the time of the Great Depression, "when maintenance of confidence in the banking system was a primary policy of government." (Comment, *The Constitutional Validity of Attachments in Light of Sniadach* v. *Family Finance Corp.* (1970) 17 U.C.L.A. L.Rev. 837, 843, fn. 39.)

labeled drugs before a hearing could be held, the court found summary seizure of misbranded drugs to be a justifiable exception to the general rule of prior notice and hearing. (See also *North American Cold Storage Co.* v. *City of Chicago* (1908) 211 U.S. 306, 315 [53 L.Ed. 195, 199, 29 S.Ct. 101].)

In each of these three cases a number of factors coalesced, justifying the resort to summary procedures. First, the seizures were undertaken to benefit the general public rather than to serve the interests of a private individual or a single class of individuals. Second, the procedures could only be initiated by an authorized governmental official, charged with a public responsibility, who might reasonably be expected to proceed only to serve the general welfare and not to secure private advantage. Third, in each case the nature of the risks required immediate action, and any delay occasioned by a prior hearing could potentially have caused serious harm to the public. Fourth, the property appropriated did not vitally touch an individual's life or livelihood. Finally, the "takings" were conducted under narrowly drawn statutes that sanctioned the summary procedure only when great necessity actually arose.

Although we believe these characteristics are generally relevant in determining the validity of summary procedures, the *Sniadach* court did cite, apparently with approval, one other case, *Ownbey* v. *Morgan* (1921) 256 U.S. 94 [65 L.Ed. 837, 41 S.Ct. 433], which involved neither the extreme public urgency nor the built-in governmental protections noted above. In *Ownbey* the court found constitutional a state statute permitting the prejudgment attachment of property of a nonresident by a resident creditor. Although the "public interest" served by such "quasi-in-rem" attachment does not appear as strong as that involved in the cases discussed above, the prejudgment attachment of a nonresident's assets, under the notions of jurisdictional authority controlling at the time of the *Ownbey* decision, frequently provided the only basis by which a state could afford its citizens an effective remedy for injuries inflicted by nonresidents. (Cf. Code Civ. Proc., § 410.10.) Moreover, because the assets subject to attachment consisted of only those items located outside of the debtor's home state, there was less possibility that such property would include "necessities" required for day-to-day living; consequently the resulting hardship to the debtor would frequently be minimal.

*Fahey, Coffin, Ewing* and *Ownbey* all involved statutes which carefully confined the operation of their summary procedures to the "extraordinary" situation in which a governmental interest necessitated such measures. Section 537, subdivision 1, by contrast, permits prenotice and prehearing attachment of a debtor's property in almost all contract actions as a

matter of course, and in no way limits its application to meet special needs. ■ The purpose served by this unusually broad attachment scheme[17] is, as the section itself relates, simply to provide unsecured creditors with "security for the satisfaction of any judgment that may be recovered." (Code Civ. Proc., § 537; see *American Industrial Sales Corp.* v. *Airscope, Inc.* (1955) 44 Cal.2d 393, 398 [282 P.2d 504].) As a three-judge federal court recently observed in a similar context in *Laprease* v. *Raymours Furniture Co.* (N.D.N.Y. 1970) 315 F.Supp. 716, 723-724, "[w]hile it is not hard to find that the interests of the . . . creditor . . . might be promoted by [this truncated procedure], the governmental interest supposedly advanced is much more elusive. The governmental interest should encompass the welfare of the alleged debtors and consumers, as well as creditors."

The agency contends, however, that the availability of a general summary attachment procedure does serve a broader purpose than merely aiding creditors. Without a generally available summary attachment remedy, plaintiff urges, creditors will find it more difficult and more expensive to collect their debts; consequently they will be obligated to raise credit rates and to terminate the extension of credit to certain higher credit risk individuals. Such a consequence, plaintiff argues, will work to the detriment of the public interest in liberalized credit.

We cannot accept the creditor's argument for several reasons. First, although the agency maintains quite steadfastly that the withdrawal of a general remedy of attachment will contract the credit market, this contention rests on nothing more solid than the agency's own assertion. While this allegation may claim some surface plausibility, several legal commentators who have undertaken empirical studies on the subject have concluded that there is "no reason to believe that attachment has any necessary effect on the availability of credit." (Comment, *The Constitutional Validity of Attachments in Light of Sniadach* v. *Family Finance Corp.* (1970) 17 U.C.L.A. L.Rev. 837, 846; see, e.g., Brunn, *Wage Garnishment in California: A Study and Recommendations* (1965) 53 Cal.L.Rev. 1214, 1240-1242.) On the present record, we are in no position to accept plaintiff's unproven assertion.

---

[17]One commentator recently noted that although attachment provisions vary considerably from state to state, most jurisdictions specifically limit the remedy to situations in which "the defendant is a nonresident, has absconded from the state or secreted himself therein, or is about to make a fraudulent conveyance or deplete his assets." (Note, *Some Implications of Sniadach* (1970) 70 Colum.L.Rev. 942, 946-947; see, e.g., Ill. Rev. Stat. 1969, ch. 11, § § 1-2; Mich. Stat. Ann. § § 27A.4001, 7401; New York Cons. Laws, Civ. Pract. Laws & Rules, § § 6201, 6211, 6212; Pa. Stat. 12 Rules of Civ. Proc., § § 1285, 1286.)

Second, even if we were to assume that a general attachment remedy is essential to the preservation of current policies of credit extension, plaintiff has not demonstrated that such credit practices serve the "general public interest." An argument can as easily be urged that the current, generally available, summary attachment procedure, by affording creditors an unusually inexpensive and expeditious legal tool, actually encourages creditors to extend credit too freely to individuals whom creditors can reasonably expect will not be able to meet future payments. (See Note (1970) 68 Mich.L.Rev. 986, 997.)[18]

Finally, and most fundamentally, this "public interest in liberalized credit," which plaintiff brandishes in the face of *Sniadach*, might equally as well have been proffered in support of Wisconsin's wage garnishment scheme; the Supreme Court's decision in *Sniadach* implicitly rejects such an interest as insufficient. Clearly, if the public does have an interest in preserving present credit policies, that interest should be pursued by methods which do not deprive a substantial proportion of debtors of their procedural due process rights. (Cf. *Shapiro* v. *Thompson* (1969) 394 U.S. 618, 633 [22 L.Ed.2d 600, 614, 89 S.Ct. 1322].)

Plaintiff and several amici curiae also suggest that the challenged attachment procedures may alternatively be justified by the interest in preventing a debtor from absconding with, or concealing, all his property as soon as he is notified of a pending action. A similar contention was raised by defendants in *Blair* v. *Pitchess* (1971) *ante*, p. 258 [96 Cal. Rptr. 42, 486 P.2d 1242] in defense of California's claim and delivery procedures. ▪ We recognize that in the attachment context, as in claim and delivery, "in some instances a very real danger may exist that the debtor may abscond with the property . . . [and] [i]n such situations a summary procedure may be consonant with constitutional principles." (*Blair* v. *Pitchess* (1971) *ante*, pp. 258, 278 [96 Cal.Rptr. 42, 486 P.2d 1242].)[19] The attachment procedure of section 537, subdivision 1, how-

---

[18]Commentators have also noted that in view of the prevailing federal bankruptcy provisions "[l]aws that freely allow attachment may precipitate bankruptcies, with attendant social costs." (Note, *Attachment in California: A New Look at an Old Writ* (1970) 22 Stan.L.Rev. 1254, 1264.) The governing statutes permit a bankruptcy court, in determining priorities, to disregard certain attachments made within four months of the initiation of bankruptcy proceedings (see Bankruptcy Act, § 67(a)(1), 11 U.S.C. § 107(a)(1) (1964)). Thus, "the creditor who attaches a substantial portion of the assets of an insolvent debtor virtually invites competing creditors to file a petition in bankruptcy as a means of preserving their rights. The result may be to force into bankruptcy going concerns that might otherwise have developed into solvent businesses." (Note, *Attachment in California: A New Look at an Old Writ* (1970) 22 Stan.L.Rev. 1254, 1264.)

[19]As discussed hereinafter in section 5, however, we have concluded that a creditor's interest, even in these "special circumstances," is not sufficient to justify de-

ever, like the claim and delivery law at issue in *Blair*, "is not limited to such extraordinary situations" (*ante* at p. 279). The section does not require a creditor to point to special facts which demonstrate an actual and significant danger that the debtor, if notified of the suit or potential attachment, will flee from the jurisdiction with his assets or will conceal his property to prevent future execution. Indeed, from the instant record it appears that this action typifies the vast majority of cases arising under subdivision 1, in which absolutely no exigent circumstances have been demonstrated which would warrant an exceptional prenotice remedy of this nature.[20]

■ In sum, the instant attachment provision authorizes the deprivation of a debtor's property without prior notice or hearing; it has not been narrowly drawn to confine such deprivation to those "extraordinary circumstances" in which a state or creditor interest of overriding significance might justify summary procedures. As such, we find that section 537, subdivision 1, constitutes a denial of procedural due process and violates article 1, section 13 of the California Constitution and the Fifth and Fourteenth Amendments of the United States Constitution. As noted above, the Supreme Courts of Wisconsin and Minnesota have recently found that general prejudgment garnishment statutes of their respective states exhibited similar constitutional deficiencies. (*Larson* v. *Fetherston* (1969) 44 Wis.2d 712 [172 N.W.2d 20]; *Jones Press, Inc.* v. *Motor Travel Service, Inc.* (1970) 286 Minn. 205 [176 N.W.2d 87].)[21]

---

priving a debtor of "necessities of life" prior to a hearing on the merits of the creditor's claim.

[20]We recognize, of course, that bank deposits, by their very nature, are highly mobile and thus that a general risk may arise that such assets will be removed to avoid future execution. We do not believe, however, that the mere potential mobility of an asset suffices, in itself, to justify depriving *all* owners of the use of such property on a general basis. Instead, in balancing the competing interests of all parties, we believe a more particularized showing of an actual danger of absconding or concealing *in the individual case* must be required.

[21]One amicus has suggested that the invalidation of subdivision 1 of section 537 may have substantial inequitable collateral effects on pending bankruptcy proceedings, in which the priority of creditors' liens frequently turn on the date a valid attachment was secured. In the present case, however, we hold no more than that the prejudgment attachment procedure of section 537, subdivision 1 violates due process insofar as it sanctions the taking of a debtor's property without notice and hearing. We perceive *no constitutional impediment* to utilizing the date on which an attachment was secured as determinative of the respective rights of competing creditors. Of course, the problems raised by amicus can only definitively be adjudicated in federal bankruptcy proceedings.

■ 5. *Since section 537, subdivision 1, is drafted so broadly that it permits the attachment of a debtor's "necessities of life" prior to a hearing upon the validity of the creditor's claim, it, in any event, violates due process.*

■ Although we have recognized above that in certain limited circumstances a creditor's interest in a summary attachment procedure may *generally* justify such attachment, the hardship imposed on a debtor by the attachment of his "necessities of life" is so severe that we do not believe that a creditor's private interest is ever sufficient to permit the imposition of such deprivation before notice and a hearing on the validity of the creditor's claim. The present broadly phrased attachment provision covers an enormous variety of property, however, sweeping widely to permit prejudgment attachment of non-necessities and necessities alike. This overbreadth constitutes a further constitutional deficiency.

■ This court has pointed out on numerous occasions that: "What is due process depends on circumstances. It varies with the subject matter and the necessities of the situation. [Citation.] Its content is a function of many variables, including the nature of the right affected . . ." (*Sokol* v. *Public Utilities Commission* (1966) 65 Cal.2d 247, 254 [53 Cal.Rptr. 673, 418 P.2d 265].) The United States Supreme Court recently reiterated this theme in *Goldberg* v. *Kelly* (1970) 397 U.S. 254, 262-263 [25 L.Ed.2d 287, 296, 90 S.Ct. 1011]: "The extent to which procedural due process must be afforded [an individual] is influenced by the *extent to which he may be 'condemned to suffer grievous loss'* [citation] *and depends upon whether the [individual's] interest in avoiding that loss outweighs the governmental interest in summary adjudication.*" (Italics added.)
■ Thus, the greater the deprivation an individual will suffer by the attachment of property, the greater the public urgency must be to justify the imposition of that loss on an individual before notice and a hearing, and the more substantial the procedural safeguards that must be afforded when such notice and hearing are required. (Compare *Goldberg* v. *Kelly* (1970) 397 U.S. 254, 270-271 [25 L.Ed.2d 287, 300-301, 90 S.Ct. 1011] with *Gideon* v. *Wainwright* (1963) 372 U.S. 335, 344-345 [9 L.Ed.2d 799, 805-806, 83 S.Ct. 792, 93 A.L.R.2d 733]; and *Sokol* v. *Public Utilities Commission* (1966) 65 Cal.2d 247, 256 [53 Cal.Rptr. 673, 418 P.2d 265] with *Mendoza* v. *Small Claims Court* (1958) 49 Cal.2d 668, 672-673 [321 P.2d 9].) In permitting a creditor to deprive a debtor of the "necessities of life" prior to a judicial determination of the validity of the creditor's claim, section 537 subdivision 1 thereby violates due process.

In *Sniadach* the majority dwelled on the considerable hardships that were imposed on a wage earner by the garnishment of wages, emphasizing

that "as a practical matter" the summary remedy often enabled a creditor to "drive [a debtor and his] family to the wall." (395 U.S. at pp. 341-342 [23 L.Ed.2d at p. 354].) Although the instant attachment provision does not permit the attachment of wages, it does enable a creditor to deprive a debtor of the use of much property at least equally vital to the debtor's sustenance. Perhaps the most obvious example of the type of hardship condemned in *Sniadach* is the attachment of the proceeds of a bank account composed of the earnings of the debtor; surely there can be no rational distinction drawn between the freezing of such wages in the hands of an employer, which was struck down in *Sniadach,* and the attachment of such moneys as soon as they have been received from the employer and deposited in a bank. In both instances the attachments serve to deprive the debtor of assets that he expects to use for everyday expenses, thus subjecting him to enormous pressure to settle the underlying claim without litigation, even when he may have a meritorious defense.[22] (See *Larson* v. *Fetherston* (1969) 44 Wis.2d 712, 718 [172 N.W.2d 20, 23]; cf. *McConaghley* v. *City of New York* (1969) 60 Misc.2d 825 [304 N.Y.S.2d 136] (summary taking of cash savings). See also Note, *Some Implications of Sniadach* (1970) 70 Colum.L.Rev. 942, 949-950; Note, *The Supreme Court 1970 Term* (1969) 83 Harv.L.Rev. 7, 117.) Of course such

[22]Although several amici suggest that under *LeFont* v. *Rankin* (1959) 167 Cal. App.2d 433 [334 P.2d 608] and *Carter* v. *Carter* (1942) 55 Cal.App.2d 13 [130 P. 2d 186], all wages in bank accounts are in fact presently exempt from attachment, we believe amici greatly exaggerate the reach of these decisions. Former Code of Civil Procedure section 690.11, repealed in 1970, provided that "earnings of the defendant . . . *received* for his personal services rendered at any time within 30 days next preceding the levy of attachment" (italics added) were subject to release upon claim of exemption, and the *LeFont* and *Carter* cases do not indicate that under the former section a defendant was entitled to trace *exempt* wages into bank accounts to obtain their release from attachment. These decisions, however, do not intimate that *all* wages in bank accounts were subject to release from attachment, as amici suggest, but instead hold that only those wages which the debtor could prove were paid for personal services rendered within the 30 days preceding the levy qualified for the exemption. Indeed, in both the *LeFont* and *Carter* cases themselves the courts refused to release attachments on the ground that the defendant had failed to show that the attached funds were not in fact savings out of wages earned more than 30 days before the levy.

Moreover, the terms of newly enacted section 690.6, which replaced former section 690.11, appear to eliminate even the limited "tracing" exemption available under the prior provision. Section 690.6 declares: "All the earnings of the debtor *due or owing* for his personal services shall be exempt from levy of attachment without filing a claim of exemption . . ." (italics added). In restricting the new statutory exemption to wages "due or owing", rather than to wages "received" by the employee, the Legislature appears to have indicated an intention to withdraw the exempt status from wages once they are paid to the wage earner, and thereby to preclude any "tracing" at all. A number of other provisions added to section 690 in 1970 draw an analogous distinction between paid and unpaid benefits. (See, e.g., Code Civ. Proc., §§ 690.15, 690.175, 690.19.)

hardship is not limited simply to the attachment of accounts containing wages, for if a debtor is unemployed, as are the Randones, or is not presently earning enough money to support his family, the freezing of all of his bank account assets will impose equally harsh deprivations upon the debtor and his family.[23]

Moreover, "[a]ttachment of any asset critical to the debtor's immediate well-being exerts the same type of pressure as does wage garnishment." (Comment, *The Constitutionality of Attachment in Light of Sniadach v. Family Finance Corp.* (1970) 17 U.C.L.A. L.Rev. 837, 847.) ▮ As we explained in our recent decision in *Blair*, extreme hardship arises not only from the attachment of liquid assets, such as wages or bank account proceeds, but also from the summary seizure of such items of personal property as " 'television sets, refrigerators, stoves, sewing machines and furniture of all kinds' " (*Blair* v. *Pitchess, ante*, pp. 258, 279 [96 Cal.Rptr. 42, 486 P.2d 1242]), items that might loosely be described as "necessities" in our modern society.[24]

In *Jones Press, Inc.* v. *Motor Travel Services, Inc.* (1970) 286 Minn. 205 [176 N.W.2d 87], the Minnesota Supreme Court observed that the attachment of accounts receivable would often involve comparable consequences. "The hardship and the injustice stressed . . . in *Sniadach* are equally applicable to the laborer, artisan or merchant whose livelihood depends on selling customers his services or his goods.. . . If the wage earner is entitled to prior notice and an opportunity to be heard, no reason occurs to us why the corner grocer, the self-employed mechanic, or the neighborhood shopkeeper should have his income frozen by the garnishment of his accounts receivable prior to the time his liability is established." (286 Minn. at p. 210 [176 N.W.2d at p. 90]; see Note, *Attachment in California: A New Look at an Old Writ* (1970) 22 Stan.L.Rev. 1254, 1271-1275.) Similarly, other courts have recently concluded that the summary repossession of a debtor's dwelling (*Mihans* v. *Municipal Court*

---

[23]Even if a debtor's current income is sufficient to support his family's immediate needs of food and shelter, once he is deprived of the assets in his bank accounts, a debtor will frequently face the hazards of having his car repossessed or defaulting on mortgage payments on his home. And even those individuals who have adequate assets in securities or other accounts to avoid these dire consequences, will not avoid the substantial embarrassment and damaged credit rating that inevitably flow from "bouncing" checks.

[24]"Beds, stoves, mattresses, dishes, tables and other necessaries for ordinary day-to-day living are, like wages in *Sniadach*, a 'specialized type of property presenting distinct problems in our economic system,' the taking of which on the unilateral command of an adverse party 'may impose tremendous hardships' on purchasers of these essentials." (*Laprease* v. *Raymours Furniture Co.* (N.D.N.Y. 1970) 315 F. Supp. 716, 722.)

(1970) 7 Cal.App.3d 479, 486 [87 Cal.Rptr. 17]) and the seizing of his clothing and other personal possessions (*Klim* v. *Jones* (N.D.Cal. 1970) 315 F.Supp. 109, 111, 123) impose like hardships.

Whereas several of the foregoing cases primarily involved the deprivation of only one kind of necessity, such as "household furnishings," the broad attachment statute before the court today combines the vices of nearly all of the invalidated procedures, since it permits the attachment of *any* and *all* property of a debtor other than wages.[25] Thus, under section 537, subdivision 1, checking and savings accounts, home furnishings, tools of the debtor's trade, automobiles, accounts receivable, and even the debtor's residence (see Code Civ. Proc., § 542, subd. 3) are initially subject to attachment without notice and hearing. Moreover, unlike the claim and delivery statute invalidated in *Blair* under which a creditor could only compel the seizure of property to which he claimed title, the instant provision initially grants unlimited discretion to the creditor to choose which property of the debtor he wishes to have attached. A creditor seeking to gain leverage in order to compel a settlement could exercise this choice so as to place a debtor under the most severe deprivation.

The court in *Sniadach* recognized that a prejudgment remedy which permits a creditor to deprive a debtor of those necessities essential for ordinary day-to-day living gives the creditor "enormous" leverage over the debtor. (395 U.S. at p. 341 [23 L.Ed.2d at p. 353].) Because of the extreme hardships imposed by such deprivation, a debtor is under severe pressure to settle the creditor's claim quickly, whether or not the claim is valid.[26] Thus sanction of such prenotice and prehearing attachments of

---

[25]In striking down California's "innkeeper's lien" statute in *Klim* v. *Jones* (N.D. Cal. 1970) 315 F.Supp. 109, the federal district court observed: "[W]age garnishment applies only to wages and only to a portion thereof, thus leaving the debtor's other property unencumbered. Under [the innkeeper lien statute], however, *all* of the boarder's possessions may be denied him if such possessions are all kept in his lodgings. With the probable exceptions of motels and inns, in each of the other rooming establishments covered by [the provisions] it is altogether likely that the occupant thereof keeps all his wordly goods there." (Original italics; 315 F.Supp. at p. 123.)

The hardships imposed by the instant attachment provision are, of course, potentially greater than those discerned in *Klim*, since pursuant to section 537, subdivision 1, a creditor can reach all property of the defendant, whether or not that property is kept at the debtor's residence.

[26]The *Sniadach* court quoted the conclusions of Congressman Sullivan, Chairman of the House Subcommittee on Consumer Affairs, with respect to the use of summary procedures in coercing the payment of fraudulent claims: " 'What we know from our study of this problem is that in a vast number of cases the debt is a fraudulent one, saddled on a poor ignorant person who is trapped in an easy credit nightmare, in which he is charged double for something he could not pay for even if the proper price was called for, and then hounded into giving up a pound of flesh. . . .' 114 Cong. Rec. 1832." (395 U.S. at p. 341 [23 L.Ed.2d at p. 353].) (See also

necessities will in many cases effectively deprive the debtor of *any* hearing on the merits of the creditor's claim. Because, at a minimum, the Constitution requires that a defendant be afforded a *meaningful* opportunity to be heard on the merits of a plaintiff's claim (see *Boddie* v. *Connecticut* (1971) 401 U.S. 371, 377 [28 L.Ed.2d 113, 118, 91 S.Ct. 780]), the state cannot properly withdraw from a defendant the essentials he needs to live, to work, to support his family or to litigate the pending action before an impartial confirmation of the actual, as opposed to probable, validity of the creditor's claim after a hearing on that issue. (See *Goldberg* v. *Kelly* (1970) 397 U.S. 254, 267 [25 L.Ed.2d 287, 298-299, 90 S.Ct. 1011].)[27]

The private interest of a creditor, even in the special circumstances of "absconding" or "concealing assets" suggested above, does not rise to the level of an "overwhelming consideration" (*Goldberg* v. *Kelly* (1970) 397 U.S. 254, 261 [25 L.Ed.2d 287, 295, 90 S.Ct. 1011]) so as to justify a deprivation of such "brutal" (*id.*) dimensions without a prior hearing on the merits.

Although the present attachment provision falls short of constitutional requirements, we note that our constitutional determination does not conflict with present legislative policy but, on the contrary, gives practical and uniform effect to the protection afforded a debtor's necessities by current exemption statutes. As explained earlier, under existing law once property has been attached a debtor is afforded an opportunity to secure the release of an attachment by demonstrating that the property being withheld is exempt from attachment under any one of the numerous statutory exemption provisions. Thus, even at present, if a debtor is aware of his legal rights and can afford to do without the attached necessity until he is able to secure its release through the courts, a creditor generally cannot gain the undue leverage afforded by the attachment of such property. Debtors are frequently unaware of available legal remedies, however, and, as we recently recognized in *McCallop,* even if they were, "while awaiting hearing upon . . . [their] claim[s] of exemption . . ., defendant[s] . . . with famil[ies] to support could undergo the extreme hardship

Project, *Resort to the Legal Process in Collecting Debts from High Risk Credit Buyers in Los Angeles—Alternative Methods for Allocating Present Costs* (1967) 14 U.C.L.A. L.Rev. 879, 898-901.)

[27]The United States Supreme Court's description of the consequences of the withdrawal of welfare payments in *Goldberg* v. *Kelly* (1970) 397 U.S. 254, 264 [25 L. Ed.2d 287, 297, 90 S.Ct. 1011], is also pertinent to the attachment of necessities. ". . . [T]ermination of aid pending a resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, affects his ability to seek redress from the welfare bureaucracy." (Original italics.)

emphasized in *Sniadach.*" (*McCallop* v. *Carberry* (1970) 1 Cal.3d 903, 907 [83 Cal.Rptr. 666, 464 P.2d 122].)

 Because of these problems, the post-attachment operation of the present exemption procedure, placing the burden on the debtor to seek exemption, does not satisfy the constitutional requirements discussed above Instead, due process requires that all "necessities" be exempt from prejudgment attachment as an initial matter.[28]

We recognize, of course, that not all attachments under the present sub-division involve deprivation of such magnitude. We do not doubt that a constitutionally valid prejudgment attachment statute, which exempts "necessities" from its operation, can be drafted by the Legislature to permit attachment generally after notice and a hearing on the probable validity of a creditor's claim (cf. *Sniadach* v. *Family Finance Corp.* (1969) 395 U.S. 337, 343 [23 L.Ed.2d 349, 354-355, 89 S.Ct. 1820] (Harlan, J. concurring); *Bell* v. *Burson* (1971) 402 U.S. 535 [29 L.Ed.2d 90, 91 S.Ct. 1586]), and even to permit attachment before notice in exceptional cases where, for example, the creditor can additionally demonstrate before a magistrate that an actual risk has arisen that assets will be concealed or that the debtor will abscond. (Cf. *Sokol* v. *Public Utilities Commission* (1966) 65 Cal.2d 247, 256 [53 Cal.Rptr. 673, 418 P.2d 265].)[29] The subdivision at issue, however, draws none of these relevant distinctions and provides none of the necessary procedural safeguards and, for the reasons discussed at some length in *Blair* (*ante* at pp. 281-284), this court cannot properly undertake the wholesale redrafting of the provision which is required. We therefore conclude that this provision, like the wage garnishment procedure at issue in *McCallop* and *Cline* and the claim and delivery procedure considered in *Blair,* is unconstitutional on its face.

---

[28]Although, as we have noted earlier, objections have been raised to the adequacy of several of the present exemption provisions in light of contemporary needs, we of course have no occasion in the instant case to evaluate the sufficiency of the coverage of current statutes. (Cf. *Santiago* v. *McElroy* (E.D.Pa. 1970) 319 F.Supp. 284, 294 (three-judge court).) We note in passing, however, that on the basis of the present record the $176.20 in the Randone's bank account attached in the present case would apparently not be exempted from attachment under section 690, even if it constituted defendants' sole source of support. (See fn. 22, *supra.*)

[29]In those cases in which attachments are authorized before notice and hearing, the debtor "must be promptly afforded the opportunity to challenge the allegations of the [creditor] and to secure the restoration of the [attached property.]" (Accord *Sokol* v. *Public Utilities Commission* (1966) 65 Cal.2d 247, 256 [53 Cal.Rptr. 673, 418 P.2d 265].)

## 6. *Conclusion*

We do no more here than follow the principle of *Sniadach*, as later expressed in our own cases of *McCallop, Cline* and *Blair*. In *Sniadach* the U.S. Supreme Court applied to modern conditions the authority of traditional procedural due process, and in so doing reaffirmed the general guarantee of notice and hearing *prior* to the deprivation of one's property. The particular significance of these decisions lies in their common recognition of the application of this principle to those especially in need of the protection afforded by such process; in the instant case, it includes those whose very necessities of life could be taken from them without a prior opportunity to show the invalidity of the creditor's claim.

California's attachment statute violates this procedural due process precept by sanctioning in substantially all contract actions attachment of a debtor's property, without notice and hearing. Nor is the overbroad statute narrowly drawn to confine attachments to extraordinary circumstances which require special protection to a state or creditor interest. Given the statute's fundamental constitutional infirmity, the attachment of the Randone's bank account cannot stand, and the lower court erred in refusing to release such attachment.

Let a peremptory writ of mandamus issue directing the appellate department to issue an order directing the trial court to dissolve the challenged attachment.

Wright, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

On September 23, 1971, the opinion was modified to read as printed above.