[L.A. No. 30474. In Bank. Apr. 1, 1976.]

T. M. COBB COMPANY, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

608

**COUNSEL**

Buchalter, Nemer, Fields & Savitch, Joseph Weissman, David W. Levene and Brian Siegel for Plaintiff and Appellant.

Gendel, Raskoff, Shapiro & Quittner, Martin Gendel and Earl A. Glick as Amici Curiae on behalf of Plaintiff and Appellant.

John H. Larson, County Counsel, and Lawrence B. Launer, Deputy County Counsel, for Defendants and Respondents.

OPINION

**SULLIVAN, J.**—In this action for recovery of personal property taxes, plaintiff T. M. Cobb Company, a California corporation, appeals from a summary judgment entered in favor of defendants County of Los Angeles and City of South El Monte. We are called upon to determine the constitutionality of procedures for summary seizure and sale in respect to the collection of taxes on unsecured property under former Revenue and Taxation Code sections 2914-2921. We must also decide the priority of the interest of the tax collector in property seized pursuant to section 2914[1] as against a previously perfected security interest.

The facts are undisputed. In October 1969 El Monte Moulding Company (El Monte) to secure payment of a loan in the sum of $187,000 from National Acceptance Company of California (National) granted to the latter a security interest in all of its personal property, equipment, inventory and other goods then owned and thereafter acquired. On December 10, 1969, and August 18, 1970, pursuant to California Uniform Commercial Code sections 9401-9408, National perfected its security interest by filing financing statements covering the collateral with the Secretary of State. Subsequently, El Monte defaulted on its obligation to National which took possession of the collateral located at 1419 Portrero Avenue in the City of South El Monte and commenced proceedings under section 9504, subdivision (3), of said code to dispose of the collateral and satisfy its outstanding security interest. On September 10, 1970, after proper notice, it conducted a private sale of certain of the inventory; the disposition of this property is not at issue. On September 16 National gave notice of a second private sale of the

---

[1]Former section 2914 (now § 2951) was contained in division 1, ("Property Taxation") part 5 ("Collection of Taxes"), chapter 4 ("Collection on the Unsecured Roll"). It provided: "Taxes due on unsecured property may be collected by seizure and sale of any of the following property belonging to or assessed to the assessee:

"(a) Personal property.

"(b) Improvements.

"(c) Possessory interests."

In 1974, the Legislature renumbered sections 2914-2921 and added certain additional sections to the system by which the tax collector may summarily seize and sell property for the collection of taxes on unsecured property. These provisions are now contained in sections 2951-2963 which are included within new article 2 of chapter 5 entitled "Seizure and Sale." These additional sections do not affect our decision as to the constitutional validity of this scheme. For convenience we shall refer to these sections by their former numbers.

Hereafter, unless otherwise indicated, all section references are to the Revenue and Taxation Code.

remaining collateral; on September 23 plaintiff T. M. Cobb Co. purchased the remainder of the collateral at the private sale.

Prior to this sale, the Los Angeles County Assessor had assessed the business personal property and fixtures of El Monte at the Portrero Avenue address and had placed the property on the 1970 unsecured tax roll of defendant county. The validity of the assessment and the amount of the tax are not disputed. These taxes on the unsecured roll became due on March 1, 1970 (§ 2901), and became delinquent when El Monte failed to pay them on August 30, 1970 (§ 2922). On September 22, 1970, after National had given notice of its second private sale and during the five-day period which must elapse between notice of a private sale and the sale itself (Cal.U.Com. Code, § 9504, subd. (3)) a deputy of the Los Angeles County Tax Collector posted a "NOTICE OF COUNTY TAX COLLECTOR'S SALE" at the El Monte premises on Portrero Avenue. This notice stated that pursuant to section 2914 of the Revenue and Taxation Code, the personal property and fixtures assessed to or owned by El Monte had been seized in order to be sold at public auction for the satisfaction of unpaid taxes, penalties, fees and costs of sale. The notice indicated that the auction would be held on September 29, 1970, and further stated that "On payment of the amount bid for any property sold, the Tax Collector, or his deputy, will deliver the property to the purchaser, with a Bill of Sale, and the title shall thereon vest in the purchaser."

On September 22, 1970, the day the seizure notice was posted and the day before plaintiff purchased the seized property, the tax collector informed plaintiff's counsel that he would refuse to release the property and would proceed to conduct the auction on September 29th unless the delinquent taxes levied on El Monte were paid. As a consequence, plaintiff, on September 25, 1970, paid under protest $8,840.54 in taxes, $530.43 in penalties, and $10 in collection fees, a total of $9,380.97. Of the taxes paid, $4,921.68 was attributable to personal property and $3,927.86 to fixtures.

On October 14, 1970, plaintiff presented to the Los Angeles County Board of Supervisors a claim for refund of the amounts paid, alleging in substance the facts stated above and asserting that the tax collector had erroneously and illegally purported to seize the property involved and had illegally collected the delinquent taxes and penalties from plaintiff as a result. The claim was denied.

Plaintiff then brought this action for refund pursuant to sections 5096-5107 and to recover taxes paid under protest pursuant to sections 5136-5143.[2] The City of South El Monte was joined as a defendant in accordance with sections 5103 and 5138; defendant county has admitted that it collected taxes in this case for the City of South El Monte.

The parties thereafter made cross-motions for summary judgment. Plaintiff's motion was denied; as previously noted, defendants' motion was granted. In summarizing the rules governing summary judgment, we stated in *Corwin v. Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851 [94 Cal.Rptr. 785, 484 P.2d 953], that "[t]he aim of the procedure is to discover, through the media of affidavits, whether the parties possess evidence requiring the weighing procedures of a trial." We also expressed our belief that this drastic, summary procedure " 'should be used with caution so that it does not become a substitute for the open trial method of determining facts.' " (*Id.,* at p. 852.) In the instant case, the parties apparently by mutual agreement and with the court's approval submitted solely on points and authorities the question whether defendants had a "good and substantial defense to the plaintiff's claim . . . ." (Code Civ. Proc., § 437c.) It appears that they were in substantial agreement as to the pertinent facts and employed this method of raising a pure question of law.

Plaintiff makes two contentions in support of its claim that the property taxes which it was compelled to pay were erroneously or illegally collected (§ 5096, subd. (b)): First, that sections 2914 and 2916 by permitting the summary seizure and sale of the property in question without prior hearing and personal notice, deprived plaintiff of property without due process of law; and second, that National's perfected security interest had priority over any interest asserted by the tax collector and that therefore upon foreclosure and sale to plaintiff any interest of the tax collector was extinguished.

I

CONSTITUTIONALITY OF SECTION 2914

Section 2914 (now § 2951; see fn. 1, *ante,* for text of § 2914) authorizes the summary seizure and sale of personal property, improvements and

---

[2]There is apparently no dispute that the plaintiff has fulfilled the statutory requirements for bringing the action. Under section 5103, plaintiff may bring an action as one who paid taxes for which a claim for refund has been rejected.

possesory interests belonging or assessed to the assessee for the collection of taxes on unsecured property. The tax collector must give "Notice of the time and place of sale . . . at least one week before the sale by publication in a newspaper in the county, or by posting in three public places." (§ 2916, now § 2957.) The property seized may be redeemed by the owner by the payment of taxes, penalties and costs at any time before it is sold. (§ 2917.5, now § 2959.) Section 2918 (now § 2960) provides that when the price bid for the property is paid, the delivery of the property with a bill of sale "vests title in the purchaser." The original property owner has no right of redemption once the property is sold. This statutory scheme affords the owner no right to a hearing prior to the seizure and sale. Once the property has been sold, the only relief available to the owner is to seek a refund on the basis that the taxes, thereby paid in part or in full by application of the proceeds of the sale, were in fact erroneously or illegally collected. We explain the inadequacy of this remedy, *infra.* (§ 5096, subd. (b).)

In our recent decision in *Dupuy* v. *Superior Court* (1975) 15 Cal.3d 410 [124 Cal.Rptr. 900, 541 P.2d 540], we considered the constitutionality of analogous procedures for the collection of jeopardy income tax assessments. Under section 18643, "A jeopardy [personal income tax] assessment[3] is immediately due and payable, and proceedings for collection may be commenced at once." The Franchise Tax Board or its authorized representative may immediately issue a warrant for the collection of the tax. (§ 18906.) This warrant, directed to any sheriff, constable, or marshal, has the same force and effect as a writ of execution and permits summary seizure and sale of nonexempt property of the taxpayer. (§ 18907.)[4] Collection of the jeopardy assessment may be stayed by the

[3] A jeopardy assessment occurs when the Franchise Tax Board finds that the assessment or the collection of a tax or a deficiency for any year will be jeopardized in whole or in part by delay, and notifies the taxpayer of this finding together with a demand for immediate payment. (§ 18641.) Section 18642 also permits the board to declare a current taxable period immediately terminated and demand immediate payment of the taxes for that period. Such a declaration and demand also permits immediate collection of the tax as described in the text. In *Dupuy*, the board imposed a jeopardy assessment as to past tax periods and declared the current period terminated.

[4] While our opinion in *Dupuy* does not directly refer to the statutory seizure and sale provisions at issue, it is clear that we were considering the procedure by which the board could collect taxes through the issuance of a warrant pursuant to sections 18906-18909.

This authority for the immediate collection of jeopardy assessments is in contrast to the procedures for collection of ordinary deficiency assessments. In the latter case, the taxpayer, by filing a written protest, may obtain a hearing before the Franchise Tax Board (§ 18592) and if the matter is determined adversely, may appeal to the State Board of Equalization. (§§ 18593, 18595.) The assessment becomes final only upon the expiration of 30 days from the time the Board of Equalization issues its opinion or its

taxpayer only by filing a bond or other sufficient security in the amount of the taxes due prior to the time the jeopardy assessment becomes final. (§ 18643.) The assessment becomes final unless a petition for reassessment is filed within 60 days after the mailing or issuance of the jeopardy assessment. (§ 18644.)

In examining this statutory scheme for jeopardy assessment of income taxes in *Dupuy* we observed that "[p]rocedural due process does not require *judicial* determination of tax liability before collection of a tax [citations]; and . . . it is established that the government may effect collection of taxes by summary administrative proceedings . . . ." (*Dupuy* v. *Superior Court, supra,* 15 Cal.3d 410, 416; italics in original.) We pointed out that since a taxpayer, after receiving notice of a tax assessment, may frustrate collection by dissipating his assets, "the government may properly require that before being entitled to a preseizure administrative hearing the taxpayer must post a bond or other security . . . ." (*Id.*) In essence we reasoned that the legitimate governmental interest in the collection of the taxes would be prejudiced if the collecting agency were required to provide a hearing before seizing the taxpayer's property, but that such governmental interest would not be frustrated by requiring a hearing after the property was seized but before it was sold. Seizure without a hearing would insure the ultimate collection of the tax; sale after a hearing would, with minimal disruption of the collection process, protect the taxpayer from a forced sale at upset values and the inadequate remedy of an ensuing claim for refund. We therefore concluded in *Dupuy* that "no legitimate government function is served by . . . [the] requirement . . . [of a bond] with respect to staying a *sale* of the property" and that "although no hearing is required prior to the seizure of the property, due process requires that the taxpayer be afforded, if desired, an administrative hearing prior to *sale* of his property." (*Id.,* at p. 417; italics in original.)

■    In the case at bench, the summary procedure for the collection of taxes on unsecured property pursuant to section 2914 is clearly analogous to the procedure, reviewed in *Dupuy,* for the collection of income taxes by means of a jeopardy assessment. Here as in *Dupuy,* the county has a substantial interest in the collection of revenue. The protection of this interest justifies the summary seizure of property. Only in this manner can the assessee be prevented from dissipating his assets and impeding the collection of the tax which he owes. (*Dupuy* v. *Superior Court, supra,*

opinion on a petition for rehearing. (§ 18596.) Only then does the tax become due, payable and collectable.

15 Cal.3d 410.) While seizure of the property may deprive the assessee or a third party claimant such as plaintiff of the use of the asset during the period between the seizure and the final determination of rights in the property at an administrative hearing, the collection of taxes is one of those extraordinary situations where "summary procedure may well meet the requirements of due process . . . ."[5] (*Sniadach* v. *Family Finance Corp.,* 395 U.S. 337, 339 [23 L.Ed.2d 349, 352, 89 S.Ct. 1820].) Although in *Sniadach, Blair* v. *Pitchess* (1971) 5 Cal.3d 258 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206], and *Randone* v. *Appellate Department, supra,* 5 Cal.3d 536, prehearing seizure remedies were condemned, "a more summary method may be provided for the collection of taxes due to the sovereign than is provided for the recovery of judgment for debts between private citizens." (*People* v. *Skinner* (1941) 18 Cal.2d 349, 354 [115 P.2d 488, 149 A.L.R. 299].)

While in the light of the foregoing principles the authorization in section 2914 for the collection of taxes due on unsecured property by seizure, without a prior hearing, of the property specified in the section (see fn. 1, *ante*) is constitutionally permissible, the authorization therein for collection by *sale* without a prior hearing is not. Given a lawful seizure, such a sale can serve no legitimate government function. It may impose a drastic and irremediable hardship upon the assessee and others claiming an interest in the property. While ultimately a sale of property may be the only method of collecting the taxes due, nevertheless the requirement of a hearing prior to such sale will protect the taxpayer from hardship without unduly disrupting the process of revenue collection. Contrary to the county's argument, the remedy of an action for the refund of taxes erroneously or illegally collected pursuant to section 2914 (see §§ 5096, subd. (b), 5098, 5103, 5104) is normally inadequate when

---

[5] As we noted in our opinion in *Randone* v. *Appellate Department* (1971) 5 Cal.3d 536, 553-554 [96 Cal.Rptr. 709, 488 P.2d 13], three of the four cases cited in *Sniadach* for the quoted proposition involved actions taken in furtherance of a substantial governmental interest and in accordance with carefully circumscribed procedures. "In each of these three cases a number of factors coalesced, justifying the resort to summary procedures. First, the seizures were undertaken to benefit the general public rather than to serve the interests of a private individual or a single class of individuals. Second, the procedures could only be initiated by an authorized government official, charged with a public responsibility, who might reasonably be expected to proceed only to serve the general welfare and not to secure private advantage. Third, in each case the nature of the risks required immediate action, and any delay occasioned by a prior hearing could potentially have caused serious harm to the public. Fourth, the property appropriated did not vitally touch an individual's life or livelihood. Finally, the 'takings' were conducted under narrowly drawn statutes that sanctioned the summary procedure only when great necessity actually arose." (*Randone* v. *Appellate Department, supra,* 5 Cal.3d 536, 554.)

the taxpayer's property has been sold. If the action is successful, the taxpayer is unable to recover an amount in excess of the proceeds of the forced sale. If the subject of the sale is business property—a common occurrence—the loss incurred may substantially impair or even defeat the taxpayer's ability to continue his enterprise. In the situation of a small businessman operating on a thin margin, a summary sale may have a devastating effect.

In view of the foregoing and applying to the instant case our rationale in *Dupuy*, we hold (1) that section 2914 insofar as it authorizes a *seizure* of the taxpayer's property without affording him an administrative hearing prior to such seizure, does not deny the taxpayer due process of law as guaranteed by the United States and California Constitutions; and (2) that section 2914 insofar as it authorizes a *sale* of the taxpayer's property without affording him an administrative hearing prior to such sale is unconstitutional on its face in that it violates the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and section 7 of article I of the California Constitution.

Nevertheless our holding above does not compel the conclusion that in the case at bench plaintiff has suffered an unconstitutional deprivation of property and on that basis is entitled to a refund of taxes as having been illegally collected. As previously stated, plaintiff purchased the taxpayer's (El Monte) property here involved on September 23, 1970, at a private sale noticed by National, the holder of a security interest therein. The property had already been seized by the tax collector on September 22, 1970. Thereafter, plaintiff paid the unsecured personal property taxes owed by El Monte and obtained from the tax collector a release of the property. Plaintiff then presented a claim for refund of the taxes paid on the basis that the tax collector had illegally seized the property and illegally collected the taxes. In sum, the property has been released; no sale is threatened, nor will one ever occur.

As we held in *Dupuy* and reaffirm in this opinion, the state, within the parameters of due process, may condition the release of property from seizure upon the payment of the taxes or the posting of a bond. Such a requirement in lieu of seizure of the property as a prerequisite to a

hearing on the validity of the tax assessment is justified because of the substantial governmental interest in the collection of revenue. Plaintiff, therefore, suffered no unconstitutional deprivation of property[6] in being required to pay the taxes in order to effect the release of the property from seizure. While the state could not have constitutionally proceeded to sell the property as it had threatened to do, no violation of due process occurred by reason of the fact that plaintiff by paying the taxes was able to terminate the seizure as well as prevent the sale. Inasmuch as a seizure will always precede a sale, and since the state may require the posting of a bond or the payment of taxes to stay a seizure, no constitutional violation takes place if the taxpayer pays the taxes or posts the bond and obtains release of the property. Although plaintiff could have chosen the alternative course of seeking an injunction to prevent the *sale (Dupuy* v. *Superior Court, supra,* 15 Cal.3d 410, 418), nevertheless even in that event plaintiff would not have obtained the release of the property. Its remedy would have been a continuance of the injunction against the sale until an administrative hearing was provided. This was the relief obtained by the taxpayer in *Dupuy* and the factor which distinguishes that case from this. Since plaintiff did not pursue such remedy and since the taxes were not unconstitutionally exacted, the only remaining issue is whether plaintiff is entitled to a refund of the taxes paid under the applicable statutory law. To that question, we now turn our attention.[7]

---

[6]The court in *Chrysler Credit Corp.* v. *Ostly* (1974) 42 Cal.App.3d 663, 673-674 [117 Cal.Rptr. 167], declined to rule on the validity of section 2914 et seq. under the due process clause and the holdings announced in *Sniadach, Randone* and *Blair* under circumstances where the plaintiff paid the taxes due in order to prevent the scheduled sale. It concluded that the purported "seizure" by posting notice stating the property had been seized and would be sold was a nullity, and that accordingly there had been no interference with a property interest of the plaintiff within the meaning of the due process clause. We disagree. In the case at bench, the payment of the taxes by plaintiff in order to free the property from whatever encumbrance was created by the tax collector's action pursuant to section 2914, clearly constituted a taking of property. Even if plaintiff is successful in obtaining a refund of these taxes in this action, the temporary deprivation of the use of its money constitutes a taking under *Sniadach* and its progeny. (*Beaudreau* v. *Superior Court* (1975) 14 Cal.3d 448, 455 [121 Cal.Rptr. 585, 535 P.2d 713].) As we hold, however, on the facts of this case the taking was in accord with due process.

[7]Plaintiff also contends that the form of notice prescribed by section 2916 is unconstitutional. Inasmuch as this plaintiff received personal notice of the purported seizure and threatened sale in sufficient time to prevent the sale we need not reach that issue. We note, however, that one appellate court has determined that a complaint seeking a declaration that the title of a purchaser at a sale pursuant to section 2914 was invalid for failure to give adequate notice and alleging that notice was given in accordance with section 2916 states a cause of action under the rule in *Mullane* v. *Central Hanover Tr. Co.* (1950) 339 U.S. 306 [94 L.Ed. 865, 70 S.Ct. 652]. (*Dohrmann Co.* v. *Security Sav. & Loan Assn.* (1970) 8 Cal.App.3d 655, 664-665 [87 Cal.Rptr. 792].)

II

## PRIORITY OF LIENS AS BETWEEN THE HOLDER OF A PERFECTED SECURITY INTEREST AND THE TAX COLLECTOR

### A

### *The Personal Property*

Plaintiff contends that the perfected security interest of National was superior to whatever interest defendants claim by virtue of the notice of seizure and that upon foreclosure of National's interest and the ensuing sale to plaintiff, defendants' interest was extinguished. Defendants, on the other hand, contend that section 2914 gave the tax collector a superior claim to the property despite National's prior perfected security interest. Essentially the county appears to claim a priority lien.[8]

It is settled law in this state that the lien of a property tax exists only by virtue of statute and that taxes are not a lien on the property assessed unless expressly made so by statute. (*Guinn* v. *McReynolds* (1918) 177 Cal. 230, 232-233 [170 P. 421]; *Grant* v. *Cornell* (1905) 147 Cal. 565, 567 [82 P. 193]; *Chrysler Credit Corp.* v. *Ostly, supra,* 42 Cal.App.3d 663, 670, fn. 5; *Escondido* v. *Escondido Lumber, Hay & Grain Co.* (1908) 8 Cal.App. 435, 439 [97 P. 197]; see generally 46 Cal.Jur.2d, Taxation, § 230, p. 755.) However, unlike taxes on real property (§ 2187), the Revenue and Taxation Code does not specifically provide that a tax on personal property constitutes an automatic lien on the property assessed. Upon assessment such a tax under certain circumstances may constitute an automatic lien on real property belonging to the owner of the personal property (§§ 2189, 2189.3), but not a lien on the personalty itself. (*Chrysler Credit Corp.* v. *Ostly, supra,* 42 Cal.App.3d 663, 671; *Dohrmann Co.* v. *Security Sav. & Loan Assn., supra,* 8 Cal.App.3d 655, 663; *In re Western States Wire Corp.* (9th Cir. 1974) 490 F.2d 1065, 1067; *Fresno County* v. *Commodity Credit Corporation* (9th Cir.) 112 F.2d 639, 641, cert. den., 311 U.S. 686 [85 L.Ed. 443, 61 S.Ct. 61] (1940).)

---

[8]Defendants take an ambivalent position. They appear to concede that the tax collector's claim to personal property is subordinate to a prior private lien and that upon seizure and sale, he conveys title subject to such prior liens. At the same time they inexplicably argue that the tax collector had the authority to sell the property here in controversy and therefore legally exacted payment of the taxes from plaintiff under threat of sale. Nowhere do they attempt to justify the tax collector's statement in his notice of sale that he will convey title to the purchaser. As we explain *infra,* the tax collector's power to sell was actually nullified since National had foreclosed its prior lien, and as a result his exaction of payment from plaintiff—the purchaser at the foreclosure sale—was unlawful.

Under the code, the taxing authority has four ways of collecting unsecured personal property taxes. First, pursuant to section 3003, the county may in a civil action sue the taxpayer in its own name for the recovery of delinquent taxes or assessments, with penalties and costs. Second, pursuant to section 3101 et seq. the official collecting taxes on the unsecured roll may file in the office of the county clerk a certificate specifying certain facts and obtain a summary judgment against the taxpayer entered by the court clerk without a hearing. This procedure results in a judgment lien against all property in any county where the lien is filed, and any such property acquired in the next 10 years. (§ 3103.) The liens resulting from either of these procedures are subordinate to the rights of all prior lienholders. (Civ. Code, § 2897.) Third, pursuant to section 2191.3 the tax collector or assessor may file a certificate of delinquency for record in the county recorder's office. From the time of such filing the amount required to be paid together with interest and penalty "constitutes a lien upon all personal and real property in the county owned by and then assessed to and in the same name as the assessee named in such certificate or acquired by him in such name before the lien expires [with an exception not here applicable] . . . ." (§ 2191.4.) However, this lien is subordinate to any other lien prior in time. (§ 2191.5.)

Sections 2914-2921 which are involved in the instant case, provide the fourth method of collection. Section 2914 permits the tax collector to seize and sell any personal property "belonging or assessed to the assessee." Nowhere does this fourth statutory scheme state what rights the tax collector has in the subject property or whether the pertinent sections invest him with rights or claims superior to other lien claimants. Nevertheless, defendants argue that the power to seize and sell property gives the tax collector an automatic lien on the property similar to the lien given to secure taxes on realty (§ 2187), and that this lien has priority over all other interests in the property. The obvious answer to this argument is that when the Legislature has intended to create a lien to secure the collection of taxes, it has done so by explicit language to that effect.[9] There is simply no basis for defendants' thesis that section 2914 has invested the tax collector with a superior claim to the unsecured property thereby creating in the words of the parties a "super-priority" over prior existing liens. ■ It is a long-established rule that tax liens are not *ex proprio vigore* superior to prior private liens. (*Guinn* v.

[9]For example, as already pointed out, the Legislature in sections 2191.3 et seq. and 3101 et seq. has expressly provided for the creation of liens in the property assessed but has stated that these liens are subordinate to others prior in time.

*McReynolds, supra,* 177 Cal. 230, 232; *California Loan etc. Co.* v. *Weis* (1897) 118 Cal. 489, 492 [50 P. 697]; *Home Owners' Loan Corp.* v. *Hansen* (1940) 38 Cal.App.2d 748, 750-754 [102 P.2d 417].) "The Legislature may make the tax lien paramount either by express provision or by reasonable implication, but the question is one of construction in any particular case." (3 Witkin, Summary of Cal. Law (8th ed. 1973) Security Transactions in Real Property, § 38, p. 1523; *Guinn* v. *McReynolds, supra; Home Owners' Loan Corp.* v. *Hansen, supra.*) ▪ The Legislature has explicitly provided that every tax declared to be a lien on real property has priority over all other liens on the real property regardless of the time of their creation. (§ 2192.1.) We cannot perceive a similar intent manifested in section 2914 in regard to taxes on personal property.

Our conclusion that the tax collector, seizing and selling personal property for taxes under section 2914, has no priority over prior private liens is supported by several authorities. The effect of a sale of personal property pursuant to section 2914 on the rights of a party claiming a prior interest in the property was considered in *Dohrmann Co.* v. *Security Sav. & Loan Assn., supra,* 8 Cal.App.3d 655. The court stated therein that the tax collector "does not . . . pass title to personal property which has been perfected from his own lien upon it; unlike the situation with realty, the law gives him no tax lien on personal property." (*Id.,* at p. 663.) It concluded that the title of a purchaser at a section 2914 sale was not impervious to challenge by a party claiming a prior interest.

Two other courts have reached the same conclusion. In *Fresno County* v. *Commodity Credit Corporation, supra,* 112 F.2d 639, the court held that the seizure of cotton pursuant to Political Code section 3821, predecessor to section 2914, created no priority over a lien on the property created prior to the assessment of taxes and the seizure. In *Chrysler Credit Corp.* v. *Ostly, supra,* 42 Cal.App.3d 663, the defendant tax collector conceded that the interest in the assessed property which he was entitled to sell pursuant to section 2914 was a limited title, subordinate to the perfected security interest of the plaintiff. The court after reviewing *Fresno County* and *Dohrmann* declared that the defendant's concession "correctly states the law with respect to the effect of a seizure and sale under section 2914 et seq. of the Revenue and Taxation Code; such proceedings are not effective to defeat or impair the interest of anyone holding a perfected security interest." (*Id.,* at p. 671.)

Only one early decision can be interpreted to suggest that a tax collector may seize and sell personal property free of prior interests.

(*RCA Photophone Inc.* v. *Huffman* (1935) 5 Cal.App.2d 401 [42 P.2d 1059].) In *Photophone,* however, the plaintiff argued only that the sale was completely invalid and did not contend that the sale could not cut off his rights in the property. The court held that the sale was valid under the predecessor to section 2914 which authorized seizure and sale of property "owned" by the assessee. The court concluded that a lessee in possession was an owner of the property for purposes of this statute. While the court did not clearly decide the issue, it can be inferred that the court believed that the tax collector could seize and sell the personal property free and clear of prior interests. To the extent that *Photophone* is inconsistent with our views herein, it is disapproved.

Finally, defendants complain of the unfairness of permitting a secured party such as National to obtain a priority interest in all present and future owned property of the assessee by use of an after-acquired property clause. We find no merit in the point. In the first place, the Legislature has specifically authorized and validated the use of an after-acquired property clause. (Cal.U.Com. Code, § 9204, subd. (3).) Secondly, recognizing that creditors may tie up all of the debtor's assets through an after-acquired property clause, the Legislature has given purchase money secured parties the opportunity to obtain superior rights as against other security interests which may have been perfected prior in time. (Cal.U.Com. Code, § 9312, subd. (3), and subd. (4).) Defendants, on the other hand, would have us construe section 2914 as affording the tax collector an even greater advantage, namely priority over all interests, whenever created, in all property, whenever acquired. We conclude that section 2914 by its language does not give the tax collector such an advantage.

In sum, we hold: First, that the power of the tax collector to seize and sell the personal property assessed to El Monte was subordinate to the interest of National; and secondly that when National foreclosed its security interest at a properly conducted private sale, plaintiff acquired such personal property free of any right of the tax collector to seize and sell it for delinquent taxes.

B

*The Fixtures*

Finally we take up the question whether section 2914 gave the tax collector priority over National in respect to the fixtures assessed to El

Monte. This issue is discussed separately from the question of priority as to the personal property because of the complicated treatment of fixtures and improvements in the Revenue and Taxation Code. We proceed, therefore, to make a detailed analysis of the provisions of the code for assessing and taxing improvements.

The Revenue and Taxation Code requires the assessor to prepare an assessment roll, as directed by the State Board of Equalization, listing all property within the county which it is the assessor's duty to assess. (§ 601.) The assessment roll must be completed on or before July 1 of each year. (§ 616.) Land and the improvements thereon must be assessed separately, that is, the assessor must separately state on the assessment roll the valuations of land and improvements. (Cal. Const., art. XIII, § 13; Rev. & Tax. Code, § 607; *Mahoney* v. *City of San Diego* (1926) 198 Cal. 388, 399 [245 P. 189].) "In preparing the assessment roll, the assessor must classify property as either secured or unsecured so that it may be entered in the appropriate part of the roll. The secured roll is that part of the assessment roll 'containing State assessed property and property the taxes on which are a lien on real property sufficient, in the opinion of the assessor, to secure payment of the taxes.' [10] Other property is placed on the unsecured roll." (Ehrman & Flavin, Taxing Cal. Property (1967) § 236, p. 212.)

The classification of property on the secured or unsecured roll has a number of important effects.[11] For purposes of this case, the most important of these is that the classification will determine the type of remedy available to the tax collector for the collection of taxes assessed

[10]The quoted language is from section 109, which provides in full as follows: " 'Roll' means the entire assessment roll. The 'secured roll' is that part of the roll containing State assessed property and property the taxes on which are a lien on real property sufficient, in the opinion of the assessor, to secure payment of the taxes. The remainder of the roll is the 'unsecured roll.' The 'local roll' is those parts of the secured and unsecured roll containing property which it is the county assessor's duty to assess. The 'board roll' is that part of the secured roll containing State assessed property."

[11]"There are two main reasons why it is important to the taxpayer whether his property is placed on the secured or unsecured rolls. Taxes on property on the unsecured roll are based, not on the current year's tax rates, but on the tax rates for the preceding tax year. During periods of fluctuating tax rates, the fact that property is on the secured or unsecured roll may make a significant difference in the amount of taxes due.

"Another important difference to the taxpayer is in the time of payment. Taxes on unsecured property are generally delinquent August 31. If the property is on the secured roll, the taxes may be paid in two installments, the first being delinquent on December 10 and the second on April 10. Thus, by getting his property on the secured roll, the taxpayer can defer the payment of his taxes and save the interest on the money." (Ehrman & Flavin, Taxing Cal. Property, *supra*, § 236, p. 212; fns. omitted.)

on the property. Taxes on property assessed on the secured roll may be collected only[12] by means of the detailed tax sale procedures in section 3351 et seq., which include waiting periods, publication of notices, notice to the assessee by registered mail, and a five-year period of redemption for anyone with an interest in the property. (See 5 Witkin, Summary of Cal. Law (8th ed. 1974) Taxation, §§ 166-178.) Taxes on property assessed on the unsecured roll may be collected by the four methods heretofore discussed (see fn. 8, *ante,* and accompanying text): suit against the taxpayer (§ 3003 et seq.); automatic summary judgment (§ 3101 et seq.); recording of certificate of delinquency (§ 2191.3 et seq.); and, the procedure at issue, summary seizure and sale (§ 2914 et seq.,[13] now § 2951 et seq.)

In view of the above statutory scheme, a determination of the priorities in the fixtures here involved requires the following analysis: First, under what circumstances does the tax on fixtures constitute a lien? Second, may such a lien be enforced through the summary procedure of seizure and sale when the taxes are assessed on the unsecured roll?

Real property is defined in the code to include improvements. (§ 104.)[14] Improvements are defined to include fixtures. (§ 105.)[15] Fixtures are, therefore, real property as that term is used in the Revenue and

[12]There are certain exceptions not pertinent to this case by which property assessed on the secured roll can be collected through procedures normally reserved for property on the unsecured roll. (§§ 107, 2189.5.)

[13]Section 2914 actually provides that "[t]axes due on *unsecured property* may be collected by seizure and sale of . . . (b) Improvements." (Italics added.) Unsecured property, however, so far as is here pertinent, is defined as property "[t]he taxes on which are not a lien on real property sufficient, in the opinion of the assessor, to secure payment of the taxes." (§ 134.) Such property would, therefore, have to be assessed on the unsecured roll. (See § 109 in fn. 10, *ante.*)

[14]Section 104 provides: " 'Real estate' or 'real property' includes:

"(a) The possession of, claim to, ownership of, or right to the possession of land.

"(b) All mines, minerals, and quarries in the land, all standing timber whether or not belonging to the owner of the land, and all rights and privileges appertaining thereto.

"(c) Improvements."

[15]Section 105 provides: " 'Improvements' includes:

"(a) All buildings, structures, fixtures, and fences erected on or affixed to the land, except telephone and telegraph lines.

"(b) All fruit, nut bearing, or ornamental trees and vines, not of natural growth, and not exempt from taxation, except date palms under eight years of age."

Hereafter, we will use the words "fixtures" and "improvements" interchangeably since the sections of the code to which we will make reference speak of improvements, thus including fixtures as well as all of the types of property covered under the definition in section 105.

Taxation Code. Under section 2187,[16] taxes on real property are liens on the property assessed. Thus, in contrast to the situation in regard to personal property, we begin with the proposition that taxes on improvements constitute automatic liens on the items assessed. (*People* v. *Smith* (1898) 123 Cal. 70 [55 P. 765]; 18 Ops.Cal.Atty.Gen. 26.) Furthermore, section 2192.1 provides that taxes declared to be liens on real property have priority over all other liens on the real property regardless of the time of their creation.[17] It is by virtue of these statutes that defendants claim priority.

While these sections establish a priority for taxes on improvements which constitute a lien on real property, they do not indicate whether such a lien will exist in every circumstance. The code contemplates the assessment of improvements in at least three different factual situations. We will deal with these situations separately because in each case the existence of the lien will depend upon the interaction of different statutes.

First: Where the improvements and the land upon which they are located are assessed to the same person, the code does not limit or restrict the lien provided by section 2187.[18] The assessor must, however, assess the improvements by showing their value opposite the description of the parcel of land on which they are located.[19] This requirement insures that anyone looking for a lien for taxes on the land will also be able to determine the amount of the lien on the improvements when they are assessed to the same person.

Second: Under section 2188.2, if the improvements are owned by someone *other* than the owner of the land, either the improvement owner or landowner can file a statement with the assessor indicating separate ownership. The assessor is then required to assess the land and the

---

[16]Section 2187 provides: "Every tax on real property is a lien against the property assessed."

[17]Section 2192.1 provides: "Every tax declared in this chapter to be a lien on real property . . . [has] priority over all other liens on the real property, regardless of the time of their creation."

[18]The code does provide in section 2188 additional security for the tax on improvements: "Every tax on improvements is a lien on the taxable land on which they are located, if they are assessed to the same person to whom the land is assessed."

[19]Section 608 provides: "Improvements shall be assessed by the assessor by showing their value opposite the description of the parcel of land on which they are located, if they are assessed to the same assessee."

improvements to the respective owners separately.[20] Whenever such a statement is filed, the lien created by section 2187 will be subject to the limitation of section 2190.2.[21] Under that section, an assessment on improvements made pursuant to section 2188.2 becomes a lien on the items assessed (§ 2187) only if the assessor notes the fact of the lien on the secured roll where the land upon which the improvements are located is listed. This notation informs anyone inquiring as to assessments on the land that the improvements thereon have been assessed to another and are subject to a lien for taxes. Without this notice, the tax collector would be able to obtain a secret lien on the improvements, as to anyone interested in the land.

Third: The third situation is exemplified by the case at bench. El Monte, the owner of the fixtures at issue at the time they were assessed, was not the owner of the land upon which the fixtures were located. Neither El Monte nor the owner of the land filed a statement of separate ownership pursuant to section 2188.2. Nevertheless, the assessor assessed the fixtures to El Monte and not the owner of the land.[22] Such an assessment is not improper. Although section 2188.2 requires the assessor to assess improvements to someone other than the owner of the land when a statement is filed, the assessor is not prohibited from doing so

---

[20]Section 2188.2 provides: "Whenever improvements are owned by a person other than the owner of the land on which they are located, the owner of the improvements or the owner of the land may file with the assessor a written statement before the lien date attesting to their separate ownership, in which event the land and improvements shall not be assessed to the same assessee."

This section was enacted in 1947 in response to the holding in *Trabue Pittman Corp.* v. *County of L. A.* (1946) 29 Cal.2d 385 [175 P.2d 512], "that improvements added and owned by a tenant could be assessed, together with the real property so improved, to the owner of the land." (*Valley Fair Fashions, Inc.* v. *Valley Fair* (1966) 245 Cal.App.2d 614, 616-617 [54 Cal.Rptr. 306].) The last clause in section 608 (see fn. 18, *ante*) limiting the requirement that an assessment of improvements be shown opposite the description of the land, to cases where the land and improvements were assessed to the same person was also apparently added in response to *Trabue.* The lien on the land to secure taxes on improvements located thereon provided by section 2188 (see fn. 17, *ante*) was also limited after *Trabue* to situations where the land and improvements were assessed to the same person.

[21]Section 2190.2 provides: "[A] tax on an assessment of . . . improvements made pursuant to the provisions of Section 2188.2 shall become a lien on . . . such improvements, provided that in those instances where the real property . . . upon which such improvements are located is not tax-exempt land, the fact of such lien shall be indicated on the secured roll where the real property . . . upon which such improvements are located is listed."

[22]The fact of separate ownership and the failure of either El Monte or the owner of the land to file a statement of separate ownership is not revealed in any of the documents in the clerk's transcript. Defendants, however, have informed us of these facts in their supplemental brief.

when such a statement has not been filed. "[T]he obvious effect of section 2188.2, added in 1947, is but a limitation on the already existing authority of the assessor to assess separately owned improvements only when a written statement attesting to separate ownership has been filed. It in no manner prohibits the assessor in the exercise of his discretion from assessing . . . the leasehold improvements to their owner . . . simply because neither [the owner of the improvements] nor the owner of the land elected to avail themselves of their right to file a written statement attesting to separate ownership under section 2188.2." (*County of Ventura v. Channel Islands State Bank* (1967) 251 Cal.App.2d 240, 246 [59 Cal.Rptr. 404].) The assessor has merely acted in accordance with the authorization in section 405 to "assess . . . the taxable property in his county . . . to the persons owning, claiming, possessing, or controlling it on the lien date."

The difficult issue raised by this discretionary separate assessment of land and improvements is whether the limitation in section 2190.2 on the lien created by section 2187 applies. If construed literally, section 2190.2 would seem to limit the lien on the improvements by requiring a notation of the fact of the lien on the roll where the separately assessed land is listed only when the assessment is made pursuant to section 2188.2. (See fns. 19 and 20, *ante.*) Accordingly, in order to obtain a lien on the improvements, the assessor would be required to note the lien where the land is assessed only if he had assessed the land and improvements separately *as a result of the filing of a statement of separate ownership.* Whenever, as in this case, the separate assessment resulted from the assessor's exercise of his own discretion, section 2190.2 would not apply and the assessor would not be required to give notice in order to obtain a lien on the improvements.

Such a construction of section 2190.2 conflicts, however, with the purpose behind restricting the lien on improvements to instances where notice is given with the assessment of the land. As indicated, the notice prevents the assessor from misleading those examining the assessment rolls for tax and other liens on the land. In light of this purpose, we are of the view that there is no reason for distinguishing between the situation where the separate assessment results from the filing of a statement and the situation where the assessor voluntarily makes such an assessment. The necessity of affording protection against secret liens exists in each instance.

Furthermore, in the only pertinent section of the code, expressly made applicable to a separate assessment resulting from the exercise of the assessor's discretion, protection against secret liens is afforded. Under section 2188.1, "[e]very tax on improvements assessed to a person other than the assessee of the land on which they are located may become a lien on the real property of the owner of such improvements . . . . In order for such tax on improvements to be a lien on any parcel of real property of the owner of such improvements, the fact of such lien must be indicated on the secured roll where any such parcel of real property is listed." We can perceive no reason why the Legislature would have provided a lien on improvements in the situation at bench without the limitation prescribed in all of these other situations. Accordingly, we conclude that the Legislature must have intended section 2190.2 to apply in all instances in which the assessor has assessed land and improvements to different assessees, and, thus, a tax on improvements can become a lien thereon only if the fact of the lien is noted on the secured roll where the land involved is listed. (Ehrman & Flavin, Taxing Cal. Property, *supra,* § 516, p. 496.)

Applying this conclusion to the facts of the case at bench, we hold that the taxes on the improvements assessed to El Monte became a lien thereon only if the assessor noted the fact of the lien where the land was listed on the secured roll. The record before us does not indicate if such a notation was made. Consequently, we proceed to consider the question of the tax collector's priority in seizing the subject property pursuant to section 2914 on the assumption that such a notation *was* made. If such a notation was not in fact made, no lien existed and the question of priority as to the fixtures is resolved in the same manner as the question of priority with respect to the personal property. (See part II A, *ante.*)

In assessing the subject fixtures on the unsecured roll, the assessor necessarily determined that any lien thereon was insufficient security for the taxes on the property. (§ 109.) He thereby made available for the collection of these taxes the procedures which have been described above. Three of those procedures, a suit against the taxpayer (§ 3003 et seq.), automatic summary judgment (§ 3101 et seq.), and an automatic lien by filing a certificate (§ 2191.3 et seq.), result in subordinate liens. Only the provisions for summary seizure and sale in sections 2914-2921 make no provision for some form of lien either by their express language or by the express language of directly related statutes. As we indicated in our discussion of priorities as to the personal property, sections 2914-

2921 do not *ex proprio vigore* give the tax collector priority over prior private liens, such as the perfected security interest of National at whose foreclosure sale plaintiff purchased the fixtures in question.

Defendants contend that when proceeding to collect the taxes pursuant to sections 2914-2921, the tax collector is enforcing and, in effect, foreclosing the priority lien of sections 2187 and 2192.1. It would seem that the mere placing of the property on the unsecured roll does not extinguish any lien created by section 2187. The decision by the assessor to place the property on the unsecured roll is only a determination that any lien securing the taxes is insufficient security. (§ 109.) The code does not provide either expressly or by reasonable implication that the lien created by section 2187 is extinguished merely because the property is assessed on the unsecured roll. (18 Ops.Cal.Atty.Gen. 26.) However, it does not follow that the tax collector can enforce the lien by means of a seizure and sale.

As we have previously indicated, the Revenue and Taxation Code provides for two basic schemes by which the collection of taxes is assured, depending upon whether the property is placed upon the secured or unsecured roll. If the assessor determines that the lien on real property is sufficient security for the tax, he lists the property on the secured roll (§ 109) and the detailed tax sale scheme becomes available for enforcement of these liens. (§ 3351 et seq.; see 5 Witkin, Summary of Cal. Law, *supra,* Taxation, §§ 166-178.) This scheme affords a great deal of protection to the assessee and others claiming an interest in the property by providing for published notice of the intent to sell the property to the state (§ 3351), publication of a list of properties upon which taxes are delinquent (§ 3371), publication of a notice of intent to deed to the state all property previously sold to the state (§ 3361), and service of summons or notice as the case may be upon the assessee and persons claiming any interest or lien in the property when the state brings an action to quiet title (§ 3591 et seq.) or sells the property at public auction (§ 3691 et seq.). Most importantly, the delinquent taxpayer or another having the requisite title or interest has at least five years within which to redeem the property by paying the taxes, penalties and costs. (§ 4101 et seq.; see 5 Witkin, Summary of Cal. Law, *supra,* Taxation, § 174.)

If the assessor places the property on the unsecured roll, deeming any lien thereon insufficient security, and the tax collector proceeds under section 2914, the assessee or any other lienholder obtains none of the

protection described above. Notice must be given only by publication or posting. (§ 2916.) There is no right whatsoever to redeem once the sale is complete. The tax collector must wait only until the taxes are delinquent before proceeding to seize and sell the property, and under the seizure and sale provisions as recently amended, he may proceed prior to the delinquency date if he determines that "seizure prior to that date is necessary because there is a great probability that the taxes will not be collectible after the delinquency date due to the financial condition of the taxpayer or other suitable reason . . . ." (§ 2953.) If we accepted defendants' contention that the tax collector should obtain the benefit of the absolute priority of a real property lien (§§ 2187, 2192.1), he could proceed to destroy any previous liens by these procedures before the lienholder had any notice of the seizure and sale, and before the lienholder was even aware that the taxes were delinquent. We cannot believe that the Legislature intended such a harsh result, nor do we believe it is necessary to insure collection of property taxes on improvements.

Under sections 2191.4 and 3103, the tax collector may obtain a lien on all the property, real and personal, owned by the assessee in the county. Furthermore, under section 3103, the tax collector may obtain a lien on all the property acquired by the assessee in the 10 years after the creation of the initial lien. This judgment provided by section 3103 may be enforced by issuance of a writ of execution in the same manner as execution may issue upon other judgments and sales on execution may be held as prescribed in the Code of Civil Procedure. (§ 3106.) These liens are in addition to the power of the tax collector to sue the assessee, obtain a judgment, and enforce that judgment like any judgment by levying a writ of execution against the nonexempt property of the taxpayer. (§ 3003.) With all of these procedures by which taxes may be collected, we can perceive no purpose in affording the tax collector the absolute power to seize property free and clear of any prior private liens. We conclude that the Legislature did not intend to create such a power, and that when seizing and selling property pursuant to section 2914 the tax collector may not enforce the lien created by section 2187. That lien exists and will continue to exist for 30 years (§ 2195), but when the assessor has placed the property on the unsecured roll, he does not have the power to enforce it by seizure and sale under section 2914. We conclude that the tax collector's claim had no priority over the security interest of National in respect to the fixtures.[23]

[23]We recognize this is an anomalous situation, but it is the inevitable result of the statutory scheme. Since the fixtures were placed on the unsecured roll, any paramount

To recapitulate, we arrive at the following conclusions: (1) That section 2914 is not unconstitutional insofar as it authorizes a *seizure* of a taxpayer's property to collect taxes on unsecured property but that insofar as it authorizes a *sale* of property for such purpose it is unconstitutional on its face as being violative of the due process clauses of the United States Constitution and the California Constitution; (2) That, under the facts of this case, plaintiff suffered no unconstitutional deprivation of property and the taxes paid by it on the unsecured property were not unconstitutionally exacted since the taxes were paid to effect release of the property from seizure and no sale ever occurred; and, (3) That, nonetheless, the tax collector illegally and erroneously exacted payment of the taxes assessed on the personal property and fixtures from plaintiff because (a) plaintiff acquired title to the *personal property* at National's foreclosure sale free and clear of any right of the tax collector since National's security interest was superior to the interest of the tax collector under section 2914, (b) the tax collector could not enforce the lien upon the *fixtures* provided by section 2187 by means of a seizure and sale pursuant to section 2914, and (c) plaintiff also acquired title to the *fixtures* at National's foreclosure sale free and clear of any right of the tax collector for the reasons given in (a) above.

The judgment is reversed and the cause is remanded to the trial court with directions to enter a summary judgment in favor of plaintiff and against defendants.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Clark, J., and Richardson, J., concurred.

---

lien on them created by section 2187 could not be enforced pursuant to the procedures provided for by section 3351 et seq.; on the other hand, enforcement of collection pursuant to section 2914 was subject to the priority of existing private liens. (See part II A, *ante.*) Although the lien of section 2187 continued to exist, it was thus in these circumstances unavailing to confer on the tax collector a superior position.